# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

OLIVIA RUX, *et al.*,

        Plaintiffs,

v.

REPUBLIC OF SUDAN,

        Defendant.

CIVIL ACTION NO. 2:04cv428

## PLAINTIFFS' MOTION TO REOPEN CASE AND ENTER JUDGMENT

NOW COME Plaintiffs, by counsel, pursuant to the newly enacted *Justice for Victims of State-Sponsored Terrorism Act* (S. 1944) (enacted January 29, 2008), and respectfully request this Court to reopen this case, to reinstate claims that were dismissed, and to enter awards of damages that were previously held to be precluded, all as provided in the recent legislation. In support thereof, Plaintiffs submit the accompanying memorandum.

        Respectfully submitted,

        OLIVIA RUX, *et al.*

        By _Mary Jane Hall_
                Of Counsel

1

Mary Jane Hall (VSB No. 26509)
KAUFMAN & CANOLES, P. C.
150 West Main Street
Suite 2100 (23510)
Post Office box 3037
Norfolk, Virginia 23514
(757) 624-3130
Fax (757) 624-3169

Andrew C. Hall (Florida State Bar No. 111480)
1428 Brickell Avenue, Penthouse
Miami, Florida 33131
(305) 374-5030
Fax (305) 374-5033

James Cooper-Hill (Texas State Bar No. 04789300)
320 Olympic
Rockport, Texas 78382
(361) 729-3923
Fax (361) 727-0447

## CERTIFICATE OF SERVICE

We hereby certify that a true and correct copy of the foregoing Plaintiffs' Motion to Reopen Case and Enter Judgment has been served via U.S. Mail on this 29$^{m}$ day of January 2008, to Gregory N. Stillman, Hunton & Williams LLP, 500 East Main Street, Suite 1000, Norfolk, Virginia 23510.

_____
Counsel for Appellants

::ODMA\PCDOCS\DOCSNFK\1324266\1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**OLIVIA RUX, et al.,**

        Plaintiffs,

v.

                                      **CIVIL ACTION NO. 2:04cv428**

**REPUBLIC OF SUDAN,**

        Defendant.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO REOPEN CASE AND ENTER JUDGMENT

This memorandum is submitted by Plaintiffs in support of their motion to reopen this case and enter judgment in favor of those Plaintiffs whose claims were dismissed, pursuant to the *Justice for Victims of State Sponsored Terrorism Act.*

### 1.    Background

Among the claims that were asserted in the instant action were the claims for intentional infliction of emotional distress by fifty-nine relatives of the servicemen and servicewomen who tragically perished as a result of the bombing of the U.S.S. COLE in Yemen on October 12, 2000. This Court dismissed those claims, finding that the Death on the High Seas Act, 46 U.S.C. app. § 762 was the exclusive remedy in this case and provided no remedy for these claimants.

This Court held in its July 25, 2007 Order that:

> [u]pon evidence adduced at a non-jury trial before this Court on March 13-14, 2007, Sudan was held liable for its provision of material support and resources to Al Qaeda, which enabled the terrorist group to bring about the attack on the U.S.S. Cole. This Court awarded damages pursuant to the Death on the High Seas Act ("DOHSA") and found that DOHSA provided the exclusive remedy for wrongful deaths. The Court denied the remaining

> claims of the 59 individual plaintiffs for damages for loss of
> consortium, loss of solatium, loss of society, mental anguish and
> emotional distress, because each of these claims is non-pecuniary
> in nature and consequently cannot be recovered under DOHSA.

The Order is attached hereto as **Exhibit "A."** The fifty-nine Plaintiffs adversely affected by that

part of the Final Judgment have appealed to the United States Court of Appeals for the Fourth

Circuit.[1]

The Court of Appeals has extended the briefing period for this appeal to February 19,

2008 because Congress had passed legislation titled *Justice for Victims of State Sponsored*

*Terrorism Act* (S.1944) ("The Act") and the bill was awaiting action by the President of the

United States. On January 28, 2008, the President signed this bill into law. The Act creates a

private cause of action for wrongful death and solatium, including pain and suffering, for victims

of terrorism that is independent of DOHSA that is the exact aspect of the law that was missing at

the time of Court's ruling. Further, The Act expressly applied retroactively. The Act is attached

hereto as **Exhibit "B."** Accordingly, the proper cause of action for the damages alleged in the

instant case is through a private cause of action for wrongful death and solatium as described in

detail below.

2.    **Argument**

The Act at §1605A(c), titled "Private Cause of Action," provides:

> A foreign state that is or was a state sponsor of terrorism as
> described in subsection (a)(2)(a)(i), and any official, employee, or
> agent of that foreign state while acting within the scope of his or
> her office, employment, or agency, shall be liable to --

---

[1] Plaintiffs have filed a Motion for Summary Reversal with the Fourth Circuit Court of Appeals contemporaneously
with the instant motion. The Motion for Summary Reversal is based upon the newly enacted legislation which
provides the Plaintiffs with a remedy, independent of DOHSA, for damages resulting from terrorism and provides
the Plaintiffs with the capability to obtain damages that were excluded under DOHSA.

2

(1) a national of the United States,

(2) a member of the Armed Forces,

(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4) the legal representative of a person described in paragraph (1), (2), or (3) [which includes a member of the armed forces], for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

The Act provides a statutory remedy for damages as a result of state-sponsored terrorism. The Act also provides that any action brought under § 1605(a)(7) allows this cause of action to be considered by the Court retroactively.

Section 1605A(c)(2)(A)(iii) provides the authority to reopen. As to any case that was "adversely affected on the grounds that [section 1605(A)(7)] fail[s] to create a cause of action against the state, ... that action, and any judgment in the action shall, on motion made by plaintiffs to the United States District Court where the action was initially brought, or judgment in the action was initially entered, be given effect as if the action had originally been filed under § 1605A(c) of Title 28, United States Code." § 1605A(c)(2)(A)(iii).

Furthermore, The Act creates a specific exception to DOHSA's otherwise general maritime application. When Congress enacts legislation, it is "generally presume[d] that Congress is knowledgeable about existing law pertinent to the legislation it enacts." Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 108 S.Ct. 1704 (U.S. 1988). Thus, Congress must be

3

presumed to have been aware that victims of terrorism on the high seas have no opportunity to recover pain and suffering. "A special law supersedes a more general one, regardless of the priority of enactment." Strackbein v. Dept. of Air Force, 2007 WL 858638 *6 (E.D. Wisc. 2007) *citing* Morton v. Mancari, 417 U.S. 535, 550-51 (1973); Preiser v. Rodriguez, 411 U.S. 475, 489-90 (1973); Bulova Watch Co. v. United States, 365 U.S. 753, 758 (1961); Central Commercial Co. v. C.I.R., 337 F.2d 387, 389 (7th Cir.1964) (stating that "it is a cardinal principle of statutory construction that the more specific controls over the more general"). *See also* U.S. v. Hinck, 2007-47 I.R.B. 1032, 127 S.Ct. 2011 (U.S. 2007) ("a precisely drawn, detailed statute pre-empts more general remedies" and "when Congress enacts a specific remedy when none was previously recognized, or when previous remedies were 'problematic,' the remedy provided is generally regarded as exclusive").

Congress' passed this Act with knowledge of the Court's reliance on DOHSA to the instant terrorism case. The Act's fact-specific application to terrorism cases, clearly indicates the intention of Congress to provide a specific remedy and an independent cause of action for terrorism cases, which is not controlled or limited by the general provisions of DOHSA. Courts no longer have to search for the proper cause of action in terrorism cases. Congress has supplied it.

Therefore, the fifty-nine Plaintiffs, all family members of the 17 sailors who died on the U.S.S. COLE, request this Court to reopen this matter, review the record, and enter a judgment in their favor for substantial damages under the *Justice for Victims of State Sponsored Terrorism Act* (S.1944), to include damages consistent with those allowed by The Act, which are initially precluded under DOHSA. Testimony generated at trial or by deposition prior to the trial is

4

sufficient for the Court to enter a revised judgment without the need for further testimony or other evidence.

**WHEREFORE**, Plaintiffs respectfully request that the Court grant their motion and award such other and further relief the Court deems appropriate.

Respectfully submitted,

OLIVIA RUX, *et al.*

By _____
                    Of Counsel

Mary Jane Hall (VSB No. 26509)
KAUFMAN & CANOLES, P. C.
150 West Main Street
Suite 2100 (23510)
Post Office box 3037
Norfolk, Virginia  23514
(757) 624-3130
Fax (757) 624-3169

Andrew C. Hall (Florida State Bar No. 111480)
1428 Brickell Avenue, Penthouse
Miami, Florida  33131
(305) 374-5030
Fax (305) 374-5033

James Cooper-Hill (Texas State Bar No. 04789300)
320 Olympic
Rockport, Texas  78382
(361) 729-3923
Fax (361) 727-0447

## CERTIFICATE OF SERVICE

We hereby certify that a true and correct copy of the foregoing Memorandum in Support of Plaintiff's Motion to Reopen Case and Enter Judgment has been served via U.S. Mail on this 29th day of January 2008, to Gregory N. Stillman, Hunton & Williams LLP, 500 East Main Street, Suite 1000, Norfolk, Virginia 23510.

Counsel for Appellants

::ODMA\PCDOCS\DOCSNFK\1324268\1

6

8331

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

OLIVIA RUX, et al.,

    Plaintiffs,

    v.

THE REPUBLIC OF SUDAN,

    Defendant.

```
FILED

AUG - 2 2007

CLERK, U.S. DISTRICT COURT
NORFOLK, VA
```

Civil Action No. 2:04cv428

## ORDER

This matter is before the Court on Plaintiffs Olivia Rux *et. al*'s ("Plaintiffs'") motion to amend this Court's Opinion & Order ("Order") of July 25, 2007, to enter judgment in the name of Plaintiffs' personal representative under the Death on the High Seas Act, 46 U.S.C. app. § 761 *et seq.*, and to award prejudgment interest [Doc. No. 86].

Plaintiffs' Motion is GRANTED. It is hereby ORDERED, pursuant to Federal Rule of Civil Procedure 60(a), that the Order of July 25, 2007, which awarded judgments for stated individuals, is hereby AMENDED such that the portion of the Order that provides judgments for each individual for stated amounts by each individuals' name is vacated and in place thereof it is substituted as follows:

It is hereby ORDERED that judgment is entered for the personal representative of each of the below-listed decedents in the following manner for the exclusive benefit of each of the listed individuals as set forth below:

1. Timothy Sceviour, as personal representative of Kenneth Eugene Clodfelter, in the sum of $498,462 plus interest at eight (8) percent per annum from October 12, 2000, to July 25,

1





2007, and post-judgment interest at the applicable post-judgment federal rate from July 25, 2007, until paid in full, for the exclusive benefit of Jennifer Clodfelter (spouse) in the sum of $296,631 plus interest as above set forth, and Noah Clodfelter (son) in the sum of $201,831 plus interest as above set forth;

2. Timothy Sceviour, as personal representative of Richard Costelow, in the sum of $998,336 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate from July 25, 2007 until paid in full, for the exclusive benefit of Sharla Costelow (wife) in the sum of $549,658 plus interest as above set forth, and Ethan Costelow (son) in the sum of $235,309 plus interest as above set forth, and Brady Costelow (son) in the sum of $213,369 plus interest as above set forth;

3. Timothy Sceviour, as personal representative of Lakeina Monique Francis, in the sum of $209,296 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Ronald Wallace Francis (father) in the sum of $104,648 plus interest as above set forth, and Sandra Annette Franois (mother) in the sum of $104,648 plus interest as above set forth;

4. Timothy Sceviour, personal representative of Timothy Lee Gauna, in the sum of $269,898 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Sarah Gauna Esquival (mother) in the sum of $269,898 plus interest as above set forth;

5. Timothy Sceviour, personal representative of Cherone Louis Gunn, in the sum of $272,620 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Louge Gunn (father) in the sum of $136,310 plus interest as above set forth, and Mona Gunn (mother) in the sum of $136,310 plus interest as above set forth;

6. Timothy Sceviour, personal representative of James Rodrick McDaniels, in the sum of $541,750 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of James Rodrick McDaniels, Jr. (son) in the sum of $329,162 plus interest as above set forth, and Diane McDaniels (mother) in the sum of $212,588 plus interest as above set forth;

7. Timothy Sceviour, personal representative of Marc Ian Nieto, in the sum of $362,411 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Jesse Leroy Nieto (father) in the sum of $362,411 plus interest as above set forth;

8. Timothy Sceviour, personal representative of Ronald Scott Owens, in the sum of $460,387 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Jamie Owens (wife) in the sum of $271,210 plus interest as above set forth, and Isabella Marie Owens (daughter) in the sum of $189,177 plus interest as above set forth;

9. Timothy Sceviour, personal representative of Lakiba Nicole Palmer, in the sum of $529,376 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007,

and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Capri Kumar (daughter) in the sum of $267,556 plus interest as above set forth, and Teresa Smith (mother) in the sum of $261,820 plus interest as above set forth;

10.  Timothy Sceviour, personal representative of Joshua Langdon Parlett, in the sum of $234,836 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Leroy Parlett (father) in the sum of $117,418 plus interest as above set forth, and Etta Parlett (mother) in the sum of $117,418 plus interest as above set forth;

11.  Timothy Sceviour, personal representative of Patrick Howard Roy, in the sum of $234,835 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Kate Brown (mother) in the sum of $234,835 plus interest as above set forth;

12.  Timothy Sceviour, personal representative of Kevin Shawn Rux, in the sum of $471,327 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Olivia Rux (wife) in the sum of $471,327 plus interest as above set forth;

13.  Timothy Sceviour, personal representative of Ronchester Mananga Santiago, in the sum of $315,416 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Rogelio Santiago (father) in the sum of $157,708 plus interest as above set forth, and Simeona Santiago (mother) in the sum of $157,708 plus interest as above set forth;

4

14. Timothy Sceviour, personal representative of Timothy Lamont Saunders, in the sum of $693,172 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Jacqueline Saunders (wife) in the sum of $368,126 plus interest as above set forth, Isley Gayle Saunders (daughter) in the sum of $147,666 plus interest as above set forth, and Jocelyn Tiera Saunders (daughter) in the sum of $177,380 plus interest as above set forth;

15. Timothy Sceviour, personal representative of Gary Graham Swenchonis, in the sum of $283,550 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Gary G. Swenchonis (father) in the sum of $141,175 plus interest as above set forth, and Deborah Swenchonis (mother) in the sum of $142,375 plus interest as above set forth;

16. Timothy Sceviour, personal representative of Andrew Triplett, in the sum of $1,273,694 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Lorrie D. Triplett (wife) in the sum of $781,465 plus interest as above set forth, Andrea Triplett (daughter) in the sum of $220,561 plus interest as above set forth, and Savannah R. Triplett (daughter) in the sum of $271,668 plus interest as above set forth;

17. Timothy Sceviour, personal representative of Craig Brian Wibberly, in the sum of $306,978 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Thomas Wibberly (father) in the sum of $153,489 plus interest as above set

5

forth, and Patricia Wibberly (mother) in the sum of $153,489 plus interest as above set forth.

The judgments against Defendant Republic of Sudan total $7,956,344 plus interest as stated above.

The Clerk of the Court is DIRECTED to transmit a copy of this Order to all counsel of record via United States mail.

IT IS SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

August 2 , 2007
Norfolk, Virginia

6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

OCT 1 2 2007

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

OLIVIA RUX, et al.,

    Plaintiffs,

    v.                                                    Civil Action No. 2:04cv428

THE REPUBLIC OF SUDAN,

    Defendant.


## ORDER

Presently before the Court is Plaintiff Timothy P. Sceviour's Amended Petition for Entry of Order Directing the Clerk to Certify Judgment entered in his favor against Defendant, The Republic of Sudan, pursuant to Title 28 of the United States Code, Section 1963. For the reasons stated herein, Plaintiff's petition is **GRANTED** and the Court hereby **ORDERS** the registration of its July 25, 2007 judgment, as amended on August 2, 2007, for enforcement in the Northern District of California, the Western District of North Carolina, and the Southern District of New York.

## I.    PROCEDURAL HISTORY

In a Default Judgment entered on July 25, 2007, and amended on August 2, 2007, this Court awarded Plaintiff $7,956,344 as personal representative to the estates of seventeen American sailors who were killed during the October 12, 2000, terrorist bombing of the American warship U.S.S. Cole. Upon evidence adduced at a non-jury trial before this Court on March 13-14, 2007, Sudan was held liable for its provision of material support and resources to Al Qaeda, which enabled the terrorist group to bring about the attack on the U.S.S. Cole. This

Court awarded damages pursuant to the Death on the High Seas Act ("DOHSA") and found that DOHSA provided the exclusive remedy for the wrongful deaths. The Court denied the remaining claims of the 59 individual plaintiffs for damages for loss of consortium, loss of solatium, loss of society, mental anguish and emotional distress, because each of these claims is non-pecuniary in nature and consequently cannot be recovered under DOHSA. The individual plaintiffs filed a Notice of Appeal on August 23, 2007, appealing that portion of the Final Opinion and Order that denied them recovery for intentional infliction of emotional distress. Defendant, The Republic of Sudan, has not appealed any part of the Opinion and Order and the time for appeal has now expired. Nor has the Defendant obtained a stay of execution or filed a supersedes bond pending appeal, pursuant to Rule 62 of the Federal Rules of Civil Procedure. Plaintiff Timothy Soeviour now seeks to execute and collect on the judgment under DOHSA outside of the Eastern District of Virginia and in the Northern District of California, the Western District of North Carolina, and the Southern District of New York.

## II.    PLAINTIFF HAS SHOWN GOOD CAUSE TO REGISTER JUDGMENT

Section 1963 of Title 28 of the United States Code provides that a judgment may be registered for the purpose of enforcement in other districts when "ordered by the court that entered judgment for good cause shown," notwithstanding the pendency of an appeal. Good cause exists upon a "mere showing" that the defendant has substantial property in another district and insufficient property in the rendering district to satisfy the judgment. David D. Siegel, Commentary on 1988 Revision, 28 U.S.C.A. § 1963 (West 1994). See also United States v. D'Elegance Mgmt. Ltd., 217 F.3d 843 (4th Cir. 2000) (affirming registration of judgment where plaintiff stated results of an asset search in his motion to register); Associated Bus. Tel. Sys. Corp. v. Greater Capital Corp., 128 F.R.D. 63 (D.N.J. 1989).

Here, Plaintiff Sceviour stated in his petition to register judgment that Plaintiffs' counsel had been unable to find any assets owned by Defendant in the Eastern District of Virginia. Counsel did, however, identify substantial property in other districts in the form of sums on deposit in bank accounts owned by Defendant. Plaintiff attached to its petition documents from the Office of Foreign Assets Control listing such accounts in the Northern District of California, the Western District of North Carolina, and the Southern District of New York. Plaintiff has thus shown good cause for registering the judgment and this Court hereby **GRANTS** Plaintiff Sceviour's petition and **ORDERS** the registration of its July 25, 2007 judgment, as amended on August 2, 2007, as set forth below:

1. Timothy Sceviour, as personal representative of Kenneth Eugene Clodfelter, in the sum of $498,462 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate from July 25, 2007, until paid in full, for the exclusive benefit of Jennifer Clodfelter (spouse) in the sum of $296,631 plus interest as above set forth, and Noah Clodfelter (son) in the sum of $201,831 plus interest as above set forth;

2. Timothy Sceviour, as personal representative of Richard Costelow, in the sum of $998,336 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate from July 25, 2007 until paid in full, for the exclusive benefit of Sharla Costelow (wife) in the sum of $549,658 plus interest as above set forth, and Ethan Costelow (son) in the sum of $235,309 plus interest as above set forth, and Brady Costelow (son) in the sum of $213,369 plus interest as above set forth;

3. Timothy Sceviour, as personal representative of Lakeina Monique Francis, in the sum

of $209,296 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Ronald Wallace Francis (father) in the sum of $104,648 plus interest as above set forth, and Sandra Annette Francis (mother) in the sum of $104,648 plus interest as above set forth;

4. Timothy Sceviour, personal representative of Timothy Lee Gauna, in the sum of $269,898 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Sarah Gauna Esquival (mother) in the sum of $269,898 plus interest as above set forth;

5. Timothy Sceviour, personal representative of Cherone Louis Gunn, in the sum of $272,620 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Louge Gunn (father) in the sum of $136,310 plus interest as above set forth, and Mona Gunn (mother) in the sum of $136,310 plus interest as above set forth;

6. Timothy Sceviour, personal representative of James Rodrick McDaniels, in the sum of $541,750 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of James Rodrick McDaniels, Jr. (son) in the sum of $329,162 plus interest as above set forth, and Diane McDaniels (mother) in the sum of $212,588 plus interest as above set forth;

7. Timothy Sceviour, personal representative of Marc Ian Nieto, in the sum of $362,411 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-

judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive

benefit of Jesse Leroy Nieto (father) in the sum of $362,411 plus interest as above set forth;

8. Timothy Sceviour, personal representative of Ronald Scott Owens; in the sum of

$460,387 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007,

and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the

exclusive benefit of Jamie Owens (wife) in the sum of $271,210 plus interest as above set forth,

and Isabella Marie Owens (daughter) in the sum of $189,177 plus interest as above set forth;

9. Timothy Sceviour, personal representative of Lakiba Nicole Palmer, in the sum of

$529,376 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007,

and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the

exclusive benefit of Capri Kumar (daughter) in the sum of $267,556 plus interest as above set

forth, and Teresa Smith (mother) in the sum of $261,820 plus interest as above set forth;

10. Timothy Sceviour, personal representative of Joshua Langdon Parlett, in the sum of

$234,836 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007,

and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the

exclusive benefit of Leroy Parlett (father) in the sum of $117,418 plus interest as above set forth,

and Etta Parlett (mother) in the sum of $117,418 plus interest as above set forth;

11. Timothy Sceviour, personal representative of Patrick Howard Roy, in the sum of

$234,835 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007,

and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the

exclusive benefit of Kate Brown (mother) in the sum of $234,835 plus interest as above set forth;

12. Timothy Sceviour, personal representative of Kevin Shawn Rux, in the sum of

$471,327 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007,

and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Olivia Rux (wife) in the sum of $471,327 plus interest as above set forth;

13.  Timothy Sceviour, personal representative of Ronchester Mananga Santiago, in the sum of $315,416 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Rogelio Santiago (father) in the sum of $157,708 plus interest as above set forth, and Simeona Santiago (mother) in the sum of $157,708 plus interest as above set forth;

14.  Timothy Sceviour, personal representative of Timothy Lamont Saunders, in the sum of $693,172 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Jacqueline Saunders (wife) in the sum of $368,126 plus interest as above set forth, Isley Gayle Saunders (daughter) in the sum of $147,666 plus interest as above set forth, and Jocelyn Tiera Saunders (daughter) in the sum of $177,380 plus interest as above set forth;

15.  Timothy Sceviour, personal representative of Gary Graham Swenchonis, in the sum of $283,550 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Gary G. Swenchonis (father) in the sum of $141,175 plus interest as above set forth, and Deborah Swenchonis (mother) in the sum of $142,375 plus interest as above set forth;

16.  Timothy Sceviour, personal representative of Andrew Triplett, in the sum of $1,273,694 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the

exclusive benefit of Lorrie D. Triplett (wife) in the sum of $781,465 plus interest as above set forth, Andrea Triplett (daughter) in the sum of $220,561 plus interest as above set forth, and Savannah R. Triplett (daughter) in the sum of $271,668 plus interest as above set forth;

17. Timothy Sceviour, personal representative of Craig Brian Wibberly, in the sum of $306,978 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Thomas Wibberly (father) in the sum of $153,489 plus interest as above set forth, and Patricia Wibberly (mother) in the sum of $153,489 plus interest as above set forth.

The judgments against Defendant Republic of Sudan total $7,956,344 plus interest as stated above.

The Clerk of the Court is DIRECTED to fax and forward copies of this Order to counsel of record for all parties.

IT IS SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

October //, 2007
Norfolk, Virginia

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

OLIVIA RUX, et al.,

     Plaintiffs,

     v.                            Civil Action No. 2:04cv428

THE REPUBLIC OF SUDAN,

     Defendant.

## OPINION & ORDER

     This action arises from the October 12, 2000, terrorist bombing of the American warship U.S.S. Cole during a temporary refueling stop in the Port of Aden, Yemen, in which seventeen American sailors were killed. Plaintiffs Olivia Rux, *et al.* ("Plaintiffs"), more than fifty surviving family members of the deceased sailors, allege that Defendant Republic of Sudan ("Sudan") is liable for damages from the attack because it provided material support and assistance to Al Qaeda, the terrorist organization whose operatives planned and carried out the attack. Plaintiffs have brought this action pursuant to the Foreign Sovereign Immunities Act ("FSIA"), *inter alia*, 28 U.S.C. § 1605(a)(7), which establishes subject matter jurisdiction for personal injury or death resulting from acts of state-sponsored terrorism. Upon evidence adduced at a non-jury trial before this Court on March 13-14, 2007, the Court concludes that judgment shall be entered for Plaintiffs.

## I.    BACKGROUND

     Plaintiffs initiated this action against Sudan on July 16, 2004. Sudan failed to appear to defend the suit, and a default was entered on February 16, 2005. The Court vacated the entry of default after Sudan made a general appearance and Sudan filed a motion to dismiss Plaintiffs'

Complaint. This Court denied the motion on August 26, 2005.[1] On September 1, 2006, the United States Court of Appeals for the Fourth Circuit affirmed this Court's denial of Sudan's motion to dismiss for lack of subject matter jurisdiction. Rux v. Republic of Sudan, 461 F.3d 461, 465-66 (4th Cir. 2006), cert. denied, No. 06-772, 127 S.Ct. 1325 (2007). Pursuant to this Court's August 26, 2005, order, Sudan was required to answer the Complaint not more than three days from the date of the issuance of the mandate from the Court of Appeals. After failing to have Plaintiffs' Complaint dismissed in its entirety, Sudan notified the Court by letter on October 25, 2006, that it would "not defend or otherwise participate in this proceeding on the merits." Def.'s Letter of Oct. 25, 2006. The deadline to file an Answer expired on October 27, 2006, without a response from Sudan. On November 2, 2006, this Court ordered Sudan to file an Answer or other responsive pleading within twenty-one days. Sudan again did not respond. In light of Sudan's refusal to participate, the clerk entered default against Sudan on February 2, 2007. However, pursuant to 28 U.S.C. § 1608(e), Plaintiffs were required to submit evidence "satisfactory to the court" before a default judgment against Sudan could be entered. 28 U.S.C. § 1608(e).

Prior to trial, Plaintiffs amended their Complaint to add claims under the Death on the High Seas Act ("DOHSA"), 46 U.S.C. app. §§ 761-767, and assert claims for intentional infliction of emotional distress and maritime wrongful death. Sudan filed a motion to dismiss the intentional infliction and maritime wrongful death claims for failure to state a claim upon which relief can be granted on grounds that DOHSA provides an exclusive remedy. The Court

---

[1] The Court denied Sudan's motion on all grounds except failure to state a claim upon which relief can be granted, which it took under advisement until Sudan was to file an Answer.

2

denied Sudan's motion at that time and reserved ruling on the choice of law and exclusivity of remedy questions. The case was tried to this Court, sitting without a jury, on March 13-14, 2007. Counsel for Sudan attended the trial but did not participate other than to make a brief argument at the end of trial regarding damages and to renew its motion to dismiss. (Tr. 201:25-202:3). The Court concluded at the end of trial that there existed sufficient evidence to enter default judgment against Sudan pursuant to 28 U.S.C. § 1608(e). This Opinion and Order details the Court's factual findings and conclusions of law. Fed. R. Civ. P. 52(a).

## II.    FINDINGS OF FACT

### A.    Legal Standard for FSIA Default Judgment

The FSIA requires that a default judgment against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This provision requires the court to satisfy itself that there exists an adequate legal and factual basis for plaintiffs' claims. Owens v. Republic of Sudan, 374 F. Supp. 2d 1, 8-9 (D.D.C. 2005). In default judgment proceedings, plaintiffs may present evidence in the form of affidavits. Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 82 (D.D.C. 2006); Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 268 (D.D.C. 2003). Upon evaluation, the court "may accept plaintiffs' uncontroverted evidence as true." Id.

In accordance with this relaxed evidentiary standard, the Court finds the following facts based on Plaintiffs' uncontroverted evidence, which consists of 183 exhibits including various depositions and live witness testimony. The exhibits relevant to the Court's finding of liability include transcripts of depositions taken by Plaintiffs of terrorism experts. R. James Woolsey was an expert who appeared voluntarily without compensation. Mr. Woolsey was the Director of

3

U.S. Central Intelligence from 1993 to 1995 and is now a Vice President at Booz Allen Hamilton in McLean, Virginia. Douglas Farah, the President of IBI Consultants, LLC, and a former reporter for the *Washington Post* in West Africa who has studied and written extensively on terror finance and radical Islamic groups, was another expert. Also deposed were Steven Emerson, Executive Director of The Investigative Project on Terrorism and an expert on Islamic extremist networks, and Lorenzo Vidino, a Research Program Manager at the Jebsen Center for Counter-Terrorism Studies at The Fletcher School of Tufts University. The evidence also includes unclassified U.S. Department of State reports; the 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States ("the 9/11 Commission Report"); a five-volume U.S. Department of the Navy report documenting the Navy's investigation into the Cole attack (the "Navy Report"); and a transcript of federal criminal proceedings against Osama Bin Laden in 2001.

B.    The Attack on the U.S.S. Cole in the Port of Aden, Yemen[2]

At approximately 8:30 a.m. on October 12, 2000, the U.S.S. Cole ("Cole") entered the Port of Aden, Yemen, to temporarily stop for refueling. The Republic of Yemen is a country of 203,850 square miles located on the southern coast of the Arabian Peninsula. Aden is a city of approximately 440,000 located on Yemen's south coast. The Port of Aden is a natural harbor with a deep draft in most areas and natural land protection on all sides. In February 1999, the Navy began using Aden instead of Djibouti as the primary refueling stop for American ships

---

[2]This section is largely based on the Navy report, which describes the attack and its aftermath in extraordinary detail. See Ex.158, Investigation to Inquire Into the Actions of USS Cole (DDG 67) In Preparing For And Undertaking a Brief Stop For Fuel at Bandar at Tawahi (Aden Harbor) Aden, Yemen, On Or About 12 October 2000.

during their 3,000-mile journey to the Arabian Gulf from the Mediterranean Sea. Under a contract entered into between the United States and Yemen, U.S. Navy vessels could obtain fuel at one of two fueling "dolphins" located near the mouth of the harbor without going to the pier.

The Cole, an Arleigh Burke Class Destroyer, was the twenty-fifth Navy ship to stop in Aden Harbor for refueling over the previous nineteen months. As of October 2000, the ship had a crew of twenty-six officers and 270 enlisted personnel. The Cole departed from its home port of Norfolk, Virginia, on August 8, 2000, before patrolling the Mediterranean Sea. On October 9, 2000, the ship transited the Suez Canal and headed for Yemen. At the time that the ship entered the Port of Aden on October 12, 2000, the U.S. Department of Defense terrorist threat level in Aden was "Threat Condition (THREATCON) BRAVO," which indicated an "increased and more predictable threat of terrorist activity."

At approximately 8:49 a.m., the Cole moored starboard side to Refueling Dolphin Seven, near the mouth of the harbor. The ship began refueling at approximately 10:31 a.m. At approximately 11:10 a.m., one of the sailors standing watch over the refueling noticed a small boat heading "fast and hard" toward the Cole from the direction of the city. The boat, painted white with fire red trim, was about thirty-five feet long and six to seven feet wide and had a shallow V-hull. It looked "brand new." (Ex. 158 at 70.) The boat was similar in size and shape to many other small vessels in the harbor, including the service craft that had been alongside the Cole. The boat was manned by two males, both of whom appeared to be in their early thirties. The two men slowed the boat as they approached the Cole, maneuvered it parallel to the ship and came down the port side headed aft. As they did so, the two men in the boat were smiling, and waved to the crew. Some crew members returned the greeting. Seconds later, the boat

5

exploded.

The explosion occurred between approximately 11:15 and 11:18 a.m., just as some of the crew was sitting down for lunch. The blast ripped a thirty-two- by thirty-six-foot hole in the port side. One sailor sleeping in his bed "was awakened by a loud explosion and thrown upward about three inches. I didn't know what happened, but I knew that anything that could throw me out of my rack had to be bad." (Id. Encl. 66 at 1.) Smoke, dust, and fuel vapors filled the air. The main engine room, auxiliary machine room, and the dry provisions storeroom were flooded. Several chambers, including the Crew and Chief Petty Officer's Galley, were structurally destroyed. The blast and its after-effects killed seventeen Navy sailors, all of them American citizens. Forty-two others were injured, some of them sustaining serious burns to their faces, hands and arms, as well as lacerations and fractures.

C.    The Decedents and Plaintiffs

Plaintiffs are fifty-nine surviving family members of the seventeen sailors who died. Seven of the plaintiffs are the surviving spouses or permanent companions of a deceased sailor, nineteen are siblings of a decedent, twenty-three are parents, and ten of the plaintiffs, on whose behalf suit is brought by the next friend of each, are minor children. The seventeen decedents are the following:

1. Kenneth Eugene Clodfelter, age twenty-one. Mr. Clodfelter, a hull technician, is survived by his wife, Jennifer Clodfelter; his minor son, Noah Clodfelter, now eight; his parents, John and Gloria Clodfelter; and his younger brother, Joseph Clodfelter, all of them plaintiffs.

2. Richard Costelow, age thirty-five. Mr. Costelow, a Chief Petty Officer specializing in electronics and communications, left behind his wife, Plaintiff Sharla Costelow; his parents,

6

Plaintiffs George and Dorothy Costelow; and his two minor sons, Plaintiffs Ethan Costelow and Brady Costelow.

3. Lakeina Monique Francis, age nineteen. Ms. Francis, of North Carolina, was a mess specialist aboard the Cole. Her survivors are her parents, Plaintiffs Ronald Wallace Francis and Sandra Annette Francis; and her younger brothers Plaintiffs David Francis, and James Winston Francis, III.[3]

4. Timothy Lee Gauna, age twenty-one. Mr. Gauna handled electronic communications aboard the Cole. He is survived by his mother, Plaintiff Sarah Gauna-Esquivel.

5. Cherone Louis Gunn, age twenty-two. Mr. Gunn, a signalman apprentice from Virginia, left behind his parents, Plaintiffs Louge Gunn and Mona Taylor Gunn; and his three brothers, Plaintiffs Jason Gunn, Jamal Gunn, and Anton J. Gunn.

6. James Rodrick McDaniels, age nineteen. Mr. McDaniels, a Virginia native who handled communications aboard the Cole, is survived by his fiancée, Plaintiff Novella Wiggins; his son, Plaintiff James Rodrick McDaniels, Jr.; his mother, Plaintiff Diane McDaniels; his sister, Plaintiff Frederica McDaniels-Bess; and two brothers not party to this suit.

7. Marc Ian Nieto, age twenty-four. Mr. Nieto, a mechanic born in Illinois, is survived by his father, Plaintiff Jesse Leroy Nieto.

8. Ronald Scott Owens, age twenty-four. Mr. Owens, an Electronic Warfare Technician, was survived by his wife, Plaintiff Jamie Owens, and daughter, Plaintiff Isabella Marie Owens,

---

[3]Presumably due to oversight, Plaintiffs David Francis and James Winston Francis, III, are not named in the body of the Fourth Amended Complaint. However, both of them were added as plaintiffs on November 12, 2004, and are named in the caption of the Fourth Amended Complaint. The Court will deem the Fourth Amended Complaint to include both of them.

now eleven.

9.  Lakiba Nicole Palmer, age twenty-two.  Ms. Palmer, a cook aboard the Cole, was survived by her daughter, Plaintiff Capri Kumar, now seven; her brother, Plaintiff Kenyon Embry; and her mother, Plaintiff Teresa Smith.

10.  Joshua Langdon Parlett, age nineteen, was a fireman/engineman aboard the Cole. His survivors are his parents, Plaintiffs Leroy Parlett and Etta Parlett, and his siblings, Plaintiffs Kera Miller, Hannah Parlett, and Matthew Parlett.

11.  Patrick Howard Roy, age nineteen.  Mr. Roy, a fireman aboard the Cole, was survived by his mother, Plaintiff Kate Brown, and his brothers, Plaintiffs Sean Walsh and Kevin Michael Roy.

12.  Kevin Shawn Rux, age thirty.  Mr. Rux, who had served twelve years in the military and specialized in electronic warfare, was survived by his wife, Plaintiff Olivia Rux.

13.  Ronchester Mananga Santiago, age twenty-two.  Mr. Santiago, a Third Class Petty Officer from San Diego, California, was survived by his parents, Plaintiffs Rogélio Santiago and Simeona Santiago.

14.  Timothy Lamont Saunders, age thirty-two.  Mr. Saunders, a Second Class Petty Officer and operations specialist, was survived by his wife, Plaintiff Jacqueline Saunders, and his minor daughters, Plaintiffs Isley Gayle Saunders, now seventeen, and Jocelyn Tiera Saunders, now thirteen.

15.  Gary Graham Swenchonis, age twenty-six.  Mr. Swenchonis, an engineer, left behind his parents, Plaintiffs Gary G. Swenchonis and Deborah Swenchonis, and his sister, Plaintiff Shalala Swenchonis-Wood.

8

16. Andrew Triplett, age thirty-one. Mr. Triplett, an engineman who had spent thirteen years in the Navy, was survived by his wife, Plaintiff Lorrie D. Triplett; his two daughters, Plaintiffs Andrea Triplett, now fourteen, and Savannah R. Triplett, now ten; his parents, Plaintiffs Reed Triplett and Savannah Triplett; and his siblings, Plaintiffs Kevin Triplett, Wayne Triplett, Freddie Triplett, and Theodis Triplett.

17. Craig Brian Wibberly, age nineteen. Mr. Wibberly was survived by his parents, Thomas Wibberly and Patricia Wibberly, and his sister, Toni Wibberly, all of them plaintiffs.

Many of the Plaintiffs learned of the attack the day it occurred from the television news, or from friends or relatives. Some families were visited by military personnel at their homes and told that their loved ones were "presumed missing." They waited anxiously, many of them for days, before being told that in fact their loved one had died. Each of the Plaintiffs suffered upon learning that their husband, son, daughter, or sibling had been murdered in a terrorist attack. As Sarah Gauna-Esquivel, Timothy Lee Gauna's mother, testified, "It was like somebody just yanked all your insides out, and part of me died when I lost my son." (Ex. 116 at 17:4-5.) Diane McDaniels testified, "[I] had a nervous breakdown. I couldn't eat, couldn't leave the house, couldn't do nothing, couldn't walk." (Ex. 122 at 14:21-23.) Plaintiff Louge Gunn, a trauma and grief counselor for the U.S. Department of Veterans Affairs, testified that he "went into a panic" when he learned that his son Cherone was killed. "I fell to the floor on my knees. And I mean it was the most devastating thing that ever happened in my life. And I don't know, at the time I just felt like somebody had put their hand inside my body and grabbed me from the inside and pulled my skin inside. That's how much pain I was in at the time." (Tr. at 29:23-30:5.) It took several days for many of the decedents' bodies to be recovered in Yemen and sent back to the

9

families in the United States. Some families held multiple funerals as additional body parts were recovered, identified, and sent home for burial.

Years after the attack, the parents, wives, husbands, children, and siblings of the brave servicemen and women murdered on October 12, 2000, continue to suffer an unimaginable loss. Many of the Plaintiffs experience depression, among other emotional and physical ailments that, they testified, began in the aftermath of the attack. To assist these relatives of the decedents, the Navy and the Department of Veterans Affairs have distributed lump-sum survivor benefits and other compensation to many Plaintiffs.[4]

### D.    Sudan and Al Qaeda

Sudan is a country of 41.2 million inhabitants at the east end of the Sahara desert in northern Africa.[5] Sudan is bounded on the northeast by the Red Sea. Directly across the Red Sea from Sudan is the Republic of Yemen, and the span between the two countries can be easily crossed by boat. (Ex. 156 at 7-15.) Sudan's population is a majority Sunni Muslim, most of whom are in the north. The country has for years been ravaged by war and humanitarian crises, including an ongoing conflict that began in the mid-1980s between the Muslim government in the north and rebels in the rural south, which is populated largely by tribal and Christian groups. A rebellion in the Darfur region of western Sudan that began in 2003 has led to the deaths of at

---

[4]By statute as of 2000, eligible survivors of members of the armed forces who die in active duty were entitled to a death gratuity payment of $6,000. See 10 U.S.C. §§ 1475, 1477-78. The statutory death gratuity benefit was increased to $100,000 in 2006. See National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136 (2006).

[5]See generally U.S. Department of State, Bureau of African Affairs, Background Note: Sudan, March 2007, http://www.state.gov/r/pa/ei/bgn/5424.htm (last visited July 23, 2007); The World Almanac and Book of Facts 830-31 (2007).

10

least 200,000 people and forced more than two million to flee to refugee camps.

In 1989, General Omar Bashir assumed the presidency of Sudan in a military junta that overthrew the elected government and converted Sudan into an Islamic Arab state. Bashir remains Sudan's President today. The coup was orchestrated by Hassan Abdallah Turabi, head of the Sudanese political party the National Islamic Front ("NIF") and leader of the Muslim Brotherhood. Turabi was the regime's de facto leader from 1989 until late 1999, when he was ousted and later put in jail. (Exs. 15 & 154 at 18; Tr. 68, 121:4-5.) During the 1990s, Turabi and the NIF transformed Sudan into a centralized, radical Islamic state that openly supported movements and organizations with militant Islamic, anti-American, anti-Western ideologies. (Exs. 153 at 12 & 154 at 18-19.) Since 1993, the United States has continuously designated Sudan as a state sponsor of terrorism. 58 Fed. Reg. 52523-01 (Oct. 8, 1993). In 1996, the United States imposed comprehensive economic, trade, and financial sanctions against Sudan. That same year, the United Nations Security Council approved sanctions against Sudan for its alleged connections to the attempted assassination of Egyptian President Hosni Mubarak.[6]

Al Qaeda is a worldwide terrorist network led by Osama Bin Laden that has declared war against the United States and others who do not share its militant brand of Islam.[7] Al Qaeda was founded by Bin Laden in Afghanistan in approximately 1990 to serve as a base for like-minded Sunni Islamic extremists. (Ex. 22.) During the Afghanistan war from 1979 to 1989, Bin Laden, the son of a wealthy Saudi construction magnate, organized and financed the recruitment and

---

[6] See S.C. Res. 1044, U.N. Doc. S/RES/1044 (Jan. 31, 1996); S.C. Res. 1054, U.N. Doc. S/RES/1054 (April 26, 1996); S.C. Res. 1070, U.N. Doc. S/RES/1070 (Aug. 16, 1996).

[7] Bin Laden and Al Qaeda are spelled various ways. The Court uses "Bin Laden" and "Al Qaeda" herein for consistency.

11

training of Arab nationals to fight alongside the Afghan mujahadin against the Soviets. (Ex. 17.)
As is well known today, Al-Qaeda has organized, executed or inspired acts of terrorism around
the world that killed or injured thousands of innocent people, including the September 11, 2001,
attacks on the United States. (Exs. 28 & 77 at 70.) Al Qaeda has supported terrorists in
Afghanistan, Bosnia, Chechnya, Tajikistan, Somalia, Yemen, and Kosovo, and has trained
terrorists from countries including the Philippines, Algeria, and Eritrea. (Ex. 23.)

Following the Soviet withdrawal from Afghanistan in 1989, Bin Laden's group was no
longer welcome in Afghanistan. Bin Laden briefly returned to his home country of Saudi Arabia
but was expelled in 1990 for his continued support of terrorism. (Id.) At a time when Al Qaeda
found itself without a territory from which it could base its terrorist operations, Turabi offered
the organization refuge in Sudan. As stated by a 1996 U.S. Department of State report on Bin
Laden, Bin Laden "relocated to Sudan in 1991, where he was welcomed by National Islamic
Front (NIF) leader Hasan al-Turabi." (Ex. 17.) Bin Laden lived in Sudan from 1991 until May
1996, when he was expelled from the country under international pressure. He then relocated to
Afghanistan. (Exs. 23 & 77 at 57, 109.)

Turabi and Bin Laden shared a common extremist ideological and religious outlook. (Ex.
77 at 61.) Turabi, who was dean of the University of Khartoum law school in the 1960s,
envisioned a pan-Islamic force consisting of both Shiites and Sunnis to counterbalance Western
powers militarily, economically, and politically. (Ex. 154 at 25, 27.) As the de facto leader of
the Sudanese regime, Turabi sought to impose *sharia*, or Islamic law, as the only source of law
in Sudan, a goal shared by Al Qaeda. (Tr. 71:9-24.) Bin Laden agreed to help Turabi in the
regime's ongoing war against African Christian separatists in southern Sudan, and also to invest

12

his wealth in the poor country's infrastructure. (Exs. 154 at 21-23 & 77 at 57; Tr. at 73:11-14.) In exchange, Sudan provided Bin Laden's fledgling terrorist group with a sanctuary within which it could freely meet, organize, and train militants for operations. (Tr. at 73.)

Bin Laden established several joint business ventures with the Sudanese regime that began to flourish upon his arrival in the Sudanese capital of Khartoum in 1991. (Ex. 17.) As stated by the U.S. Department of State, Bin Laden "formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf." (Id.) Bin Laden's businesses in Sudan included (1) Al-Hijrah for Construction and Development, Ltd., which built the Tahaddi road between Khartoum and Port Sudan on the Red Sea coast, as well as a modern international airport near Port Sudan; (2) An import-export firm, Wadi al-Aqiq Company, Ltd., which, in conjunction with Bin Laden's Taba Investment Company, Ltd., and with the cooperation of prominent NIF members, secured a near monopoly over Sudan's agricultural exports of gum, corn, sunflower, and sesame products; and (3) Al-Themar al-Mubarak-ah Agriculture Company, Ltd., which acquired large tracts of land near Khartoum and in eastern Sudan. (Exs. 17 & 32 at 239, 241.) These businesses provided income to Al Qaeda, as well as cover for the procurement of explosives, weapons, and technical equipment, and for the travel of Al Qaeda operatives. (Exs. 24 & 77 at 57-58.) Bin Laden continued to maintain his substantial business interests and facilities in Sudan even after his departure to Afghanistan in 1996. (Exs. 23 & 156 at 26-27.)

Sudan allowed its banking institutions to be used by Al Qaeda to launder money. (Ex. 154 at 25.) Bin Laden and wealthy members of the NIF capitalized Al-Shamal Islamic Bank in Khartoum; Bin Laden personally invested $50 million in the bank. (Exs. 17 & 32 at 332.) In the

late 1980s, Sudan adopted an Islamic banking system that forbids interest and lacks the rigorous accounting standards used by Western banking systems. (Tr. 84:5-16; Ex. 154 at 36.) The lack of scrutiny associated with this system was ideal for Al Qaeda because it allowed the group to move large sums of money in support of its operations without detection. (Exs. 154 at 52 & 153 at 15.) As Mr. Farah, who is the author of "Blood From Stones: The Secret Financial Network of Terror," testified, Sudan "provided [Al Qaeda] fundamentally with a banking structure, Islamic structure that's out of the norm of the banking rules that we're acquainted with in the west, and allowed them channels to move money through that would be virtually undiscoverable to the outside world." He added that Sudan "clearly had control over the banking system . . . . [Al Qaeda] couldn't have operated with that degree of freedom and openness if they had not been sanctioned by the central government to do so." (Ex. 153 at 14-15, 26.)

In addition, as reported by the U.S. Department of State in its annual "Patterns of Global Terrorism" reports, the Sudanese military cooperated with Bin Laden and Al Qaeda to finance at least three terrorist training camps in northern Sudan by January 1994. (Ex. 17; Tr. 75:21-24.) Bin Laden's Al-Hijrah for Construction and Development company worked directly with Sudanese military officials to transport and provision the camps, where terrorists of Egyptian, Algerian, Tunisian, and Palestinian origin received training. From as early as 1997 to at least 1999, Sudan served as a "training hub" for Al Qaeda and other terrorist groups that used Sudan as a secure base for assisting compatriots elsewhere. Furthermore, starting as early as 1997 the Sudanese Government provided paramilitary training to terrorist organizations in Sudan.[8]

---

[8] See Ex. 17 State Department Fact Sheet on Bin Ladin, August 17, 1996; Ex. 22, *Patterns of Global Terrorism: 1997*, U.S. Department of State, April 1998 at 50; Ex. 25, *Patterns of Global Terrorism: 1998*, U.S. Department of State, April 1999; Ex. 28, *Patterns of Global*

14

Starting in the early 1990s, Turabi and the Sudanese regime convened annual conferences in Sudan under the label Popular Arab and Islamic Conference. At these conferences, Bin Laden and other top leaders and operatives from the most violent Islamic terrorist organizations, including Bin Laden's Islamic Army Shura, the Palestinian Liberation Organization, Hamas, and Hezbollah, congregated to exchange information and plan terrorist activities. (Exs. 77 at 61 & 154 at 26.) Turabi saw the conferences as a means of bringing together Sunnis and Shiites in the fight against the common enemy, i.e. the United States and other Western powers. (Ex. 77 at 61.) Mr. Woolsey testified that he was aware of the Popular Arab and Islamic Conference when he was Director of Central Intelligence in the early 1990s. He testified, "[W]e used to call it sort of the terrorist equivalent of the Paris Air Show. It was really quite remarkable. Those of us working in U.S. intelligence [never] thought that Sudan would be this blatant in pulling all of these terrorist organizations together in an annual conference." (Ex. 156 at 20). Although the conference was closed down in approximately 2000, Sudan "continued to be used as a safehaven" by Al Qaeda and other terrorist groups. (Ex. 35.)

As early as 1998, Sudan provided Al Qaeda members with Sudanese diplomatic passports as well as regular Sudanese travel documentation that facilitated the movement of Al Qaeda operatives in and out of Sudan. (Exs. 22; 25; 35; 154 at 31; 53 & 157 at 28.) Diplomatic passports allow the holder to pass through airport security in airports and ports around the world without his bags being checked and without the same level of scrutiny or searches normally given to regular passport holders. (Exs. 154 at 32 & 153 at 17). A diplomatic passport typically lasts between five and ten years (Ex. 154 at 33). Thus, these diplomatic passports issued in 1998

---

*Terrorism: 1999*, U.S. Department of State, April 2000.

would not have expired prior to 2003. The use of diplomatic passports allowed Al Qaeda agents to enter and leave Sudan and cross borders in other countries with diplomatic pouches carrying secret materials to prepare for attacks without arousing suspicion (Exs. 156 at 19; 154 at 33; 157 at 31 & 153 at 14). The Government of Sudan's provision of diplomatic passports to Al Qaeda, which was necessarily a government function carried out by Government officers or agents, was critical to Al Qaeda's method of training its operatives in one country and then dispatching them with their materials to other countries to carry out operations or await instructions. (Tr. 94:23-95:9). By giving Al Qaeda diplomatic passports, as well as diplomatic pouches that could be carried without inspection, Sudan enabled Al Qaeda to transport weapons and munitions outside the country and into other countries undetected by Customs agents. (Exs. 157 at 25; 153 at 18). As Mr. Woolsey testified, diplomatic passports "would permit them to move materials without scrutiny in a number of circumstances, and would, I think, be quite helpful in helping them prepare to—for any terrorist attack." (Ex. 156 at 19:2-6). In addition, Sudan exempted Al Qaeda and its members from paying any taxes or import duties and permitted it to bring containers into the country without inspection by Customs (Ex. 154 at 49-50; Ex. 32 at 238-39).

Sudan's support to Al Qaeda continued even after Bin Laden's expulsion from the country in 1996 and lasted at least until the Cole bombing in October 2000. As reported in the U.S. Department of State's annual "Patterns of Global Terrorism" reports, each year from 1997 through 2000 Sudan continued to serve as a meeting place, safe haven, and training hub for Al Qaeda and other terrorist groups including Lebanese Hizballah, Palestinian Islamic Jihad, Abu Nidal Organization, and Hamas. As of 1999, this support included "paramilitary training, money, religious indoctrination, travel, documents, safe passage, and refuge" and as of 2000 it

16

"included the provision of travel documentation, safe passage, and refuge. Most of the groups maintained offices and other forms of representation in the capital, using Sudan primarily as a secure base for organizing terrorist operations and assisting compatriots elsewhere." (Exs. 25 & 28.) Mr. Woolsey, who reviewed Plaintiffs' evidence, testified, "[M]y judgment, given the information I've seen here, and given my understanding of the propensities of these types of organizations in that part of the world, I'd say it's quite likely that there was cooperation between Sudanese government principally, probably through its intelligence services, and al-Qaida, as of late 2000." (Ex. 156 at 25.)

The strike against the Cole was part of a decade-long plan conceived and executed by Bin Laden and Al Qaeda to attack U.S. interests in the Middle East, specifically American military forces. (Ex. 72 at 29.) In early 1992, when he was based in Sudan, Bin Laden issued a fatwa that stated that U.S. forces stationed in the Arabian Peninsula, where Yemen is located, should be attacked. (Exs. 24; 54 at 28 & 77.) A fatwa is an Islamic religious decree which purports to direct Muslim followers to commit, or not to commit, certain acts. (Tr. 72:5-13.) Fatwas provided Al Qaeda with religious justification for its terrorist attacks. (Ex. 154 at 29.) By 1992, Bin Laden was well known and a senior figure among Islamic extremists. (Ex. 77 at 59.) At the time that Bin Laden issued his fatwa in 1992, the only American military presence in Yemen was that of Navy vessels refueling in Aden Harbor. (Ex. 154 at 28-30.) In that regard, the fatwa provided religious support for an attack directed at the U.S. Navy. (Id. at 29.) In December 1992, Al Qaeda operatives bombed two hotels in Aden, Yemen, occasionally used by U.S. military personnel, killing two tourists but no Americans. (Exs. 72; 17 & 77 at 59.) According to the 9/11 Commission Report, citing CIA and FBI intelligence reports, the

17

perpetrators of that 1992 attack "are reported to have belonged to group from southern Yemen headed by a Yemeni member of Bin Laden's Islamic Army Shura; some in the group had trained in an al Qaeda camp in Sudan." (Ex. 77 at 60 & n.44; Tr. 95:25-6:11.) In August 1996, Bin Laden issued a statement outlining Al Qaeda's goals: drive United States forces from the Arabian Peninsula, overthrow the Government of Saudi Arabia, "liberate" Muslim holy sites in "Palestine," and support Islamic revolutionary groups around the world. (Ex. 22.) On February 23, 1998, Bin Laden issued another fatwa that was published by allied groups under the name "World Islamic Front for Jihad Against the Jews and Crusaders." (Ex. 25.) The statement asserted that America had declared war against God and his messenger, and that the murder of any American, military or civilian, was the "individual duty for every Muslim who can do it in any country in which it is possible to do it." (Ex. 77 at 47.) Bin Laden also stated in February 1998, "If someone can kill an American soldier, it is better than wasting time on other matters." (Ex. 23.) By the time he issued his 1998 declaration of war, Bin Laden's organization had blossomed into a substantial, worldwide organization. (Ex. 77 at 55.) Less than a month after the fatwa was published, Al Qaeda operatives began planning the August 7, 1998, bombings of the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, which killed twelve Americans and 212 others, and injured about 5,000 others. (Id. at 69-70.) This was at a time when the Sudanese Government provided the diplomatic passports and military help in transporting materials used by Al Qaeda in its terrorist activities against the United States.

The Cole plot was an Al Qaeda operation supervised directly by Bin Laden. As stated in the 9/11 Commission Report, Bin Laden "chose the target and location of the attack, selected the suicide operatives, and provided the money needed to purchase explosives and equipment." (Id.

at 190.) Mr. Emerson and Mr. Vidino both testified that the attack's "mastermind" was Qaed Salim Sinan al-Harethi, also known as Ali Qaed Sinan Harthi, who was one of Bin Laden's bodyguards. (Tr. 108:6-7; Exs. 154 at 45-46 & 157 at 33.)[9] Mr. Emerson and Mr. Vidino both testified that Al-Harethi was trained by Al Qaeda *in Sudan* in the 1990s before being dispatched to Yemen where, according to Mr. Vidino, he became "the chief of operation[s] of Al Qaeda in Yemen." (Tr. 108:10-20; Ex. 154 at 46.) Mr. Woolsey, the former CIA Director, testified that "more likely than not" Sudan was the source of the explosives used in the Cole bombing. (Ex. 156 at 29.) Mr. Emerson testified, "I have no doubt the source [of the explosives used on the Cole] came from Al Qaeda and was transported to Yemen from Al Qaeda or by the Sudanese government through most probably the diplomatic pouch." (Ex. 157 at 26.) Mr. Farah testified that his "best guess" as to the source of the explosives used in the Cole, based on his "studied opinion and having discussed this case with intelligence officials," is Sudan, "which was the closest place to Yemen in which they had the safe quarter in which to be able to move this type of goods across the border." (Ex. 153 at 18-19.) In view of the foregoing, there is sufficient evidence for purposes of the default judgment standard in 28 U.S.C. § 1610, and the Court FINDS as a fact, that the explosives used in the Cole attack were sent by Al Qaeda operatives in Sudan. This finding is corroborated by the testimony of one of Bin Laden's lieutenants in Sudan, Jamal Al-Fadl, who testified in criminal proceedings against Bin Laden arising out of the

---

[9]See also Ex. 57, Michael Slackman, *Yemeni Religious Leader Tied to* Cole, L.A. Times, Jan. 15, 2003 (Harthi was "the man accused of organizing the suicide attack on the Cole"); Ex. 56, Elaine Monaghan & Daniel McGrory, *Death of Terror Chief Deals Severe Blow to al-Qaeda*, The Times of London, Nov. 5, 2002 (al-Harethi was the "mastermind" behind the Cole, "a key ally of Bin Laden and was on the FBI's most-wanted list"). Al-Harethi and five other Al Qaeda operatives were reportedly killed in a missile strike fired from an unmanned U.S. aircraft in November 2002. (Ex. 57.)

1998 embassy bombings. (Ex. 32, <u>United States v. Bin Laden</u>, Case No. 198CR1023, Trial Tr. Feb. 6, 2001). Mr. Al-Fadl stated in sworn testimony in a trial before the United States District Court for the Southern District of New York that he worked under Bin Laden in Sudan; that he stored four crates of weapons and explosives at a farm in Sudan owned by Bin Laden; and that he shipped the four crates in an Al Qaeda-owned boat from a facility owned by the Sudanese military in Port Sudan to Yemen, where they were to be used to "fight the Communists." (Ex. 32 at 262, 336-40.)

Based on the expert testimony and documentary evidence, the Court FINDS as a fact that Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al Qaeda with the support, guidance, Sudanese diplomatic passports and resources that allowed it to transform into a sophisticated, worldwide terrorist network, and that such support was critical to Al Qaeda developing the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack that killed the seventeen American sailors on the U.S.S. Cole. Each of the expert witnesses testified that the strike against the Cole would likely not have occurred without Sudan's support and assistance to Al Qaeda in the form of safe haven, military training, diplomatic passports, business partnerships, and lax banking and accounting systems that facilitated money laundering. As Mr. Woolsey, the former CIA Director, testified, the Cole attack "might have been possible, but it would not have been as easy" without Sudan's support. Mr. Woolsey testified, "The proximity of Sudan to—to Yemen, the need for a protected logistics infrastructure, the confused situation in the Government of Yemen at the time . . ., the amount of explosives that needed to be put in the boat that attacked the Cole, all that suggests to me that the logistical support and base of operations that could have

20

been available in Sudan could have been of substantial assistance to an attack in Yemen, such as the one that occurred." (Ex. 156 at 29.) Mr. Vidino testified that the bombing would have been "close to impossible" without Sudan's assistance because "simply all they needed, starting from the training to the explosives, to all what a terrorist cell needs, even the ideological aspect of it, came from Sudan. It was clearly necessary to have all these things in place to carry out an operation such as the attack on the Cole." (Tr. 112:12-17; Ex. 154 at 47-48.) Mr. Emerson testified that the Cole attack would not have occurred without Sudan. "You would have deprived them of the oxygen needed to operate." (Ex. 157 at 34.) Moreover, Mr. Farah testified, "I don't think the bombing of the Cole could have happened without the active support of the Government of Sudan. . . . I think that from 1992 through the Cole bombing, Sudan provided an incredibly necessary and vital infrastructure for Al-Qaeda to be able to prepare and move the explosives and carry out the attacks on the Cole. And it was not clandestine or hidden presence, but rather fairly overt and knowing presence by senior members of the NIF government in Sudan." (Ex. 97 at 14, 27-30.) The diplomatic passports and pouches utilized by Al Qaeda in furtherance of its terrorist activities were furnished by agents or officials of the Government of Sudan acting within the scope of their office, employment, or agency. Based on this testimony and the evidence supporting it, the Court FINDS as a fact by substantial evidence that Sudan's material support to Al Qaeda led to the murders of the seventeen American servicemen and women on October 12, 2000, in the territorial waters of Yemen.

III.    CONCLUSIONS OF LAW

    A.    Jurisdiction

The FSIA of 1976, 28 U.S.C. § 1602 et seq., provides the "sole basis for obtaining

21

jurisdiction over a foreign state in [federal] court[]." Argentine Republic v. Amerada Hess

Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L. Ed. 2d 818 (1989). Under the

FSIA, foreign states enjoy immunity from suit in U.S. courts unless Congress waives immunity

under an enumerated exception. 28 U.S.C. § 1604; see id. §§ 1605-1607. The exception at issue

in this case is § 1605(a)(7), also known as the "terrorism exception," which was enacted in 1996

as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). See Pub. L. No. 104-

132, § 221, 110 Stat. 1214 (1996) (codified at 28 U.S.C. § 1605(a)(7)). Section 1605(a)(7)

waives immunity of a foreign state in any case

> in which money damages are sought against a foreign state for personal injury
> or death that was caused by an act of torture, extrajudicial killing, aircraft
> sabotage, hostage taking, or the provision of material support or resources (as
> defined in section 2339A of title 18) for such an act if such act or provision is
> engaged in by an official, employee, or agent of such foreign state while acting
> within the scope of his or her office, employment, or agency . . . .

§ 1605(a)(7). The terrorism exception has the following jurisdictional requirements: "(1) the

provision of material support by a state sponsor of terrorism; (2) the provision of such support by

an official of the state 'while acting within the scope of his or her office, employment, or

agency'; and (3) a causal link between the material support and damage resulting from an act of

terrorism." Rux, 461 F.3d at 467 (citing § 1605(a)(7)). The exception applies only if the foreign

state against whom the suit is brought was designated as a state sponsor of terrorism by the U.S.

Department of State at the time the act occurred or as a result of the act, the foreign state was

afforded a reasonable opportunity to arbitrate the claim if the alleged act occurred in the foreign

state against which the claim has been brought, and either the claimant or the victim was a

national of the United States at the time of the alleged act. 28 U.S.C. § 1605(a)(7)(A) & (B)(i)-

(ii).

The Court reaffirms its finding, which was affirmed by the Court of Appeals prior to submission of the evidence, that it has jurisdiction over the subject matter of this action. Rux, 461 F.3d at 467-75. Sudanese Government officials, employees, or agents acting within the scope of their office provided various forms of "material support" as defined in 18 U.S.C. § 2339A(b), including lodging, safehouses, financial services, false documentation, and transportation, to Al-Qaeda, whose operatives planned and carried out the Cole bombing. See 18 U.S.C. § 2339A(b)(1) (defining "material support or resources").[10] The deliberate murder of the seventeen American sailors qualifies as an "extrajudicial killing."[11] Jurisdictional causation under 28 U.S.C. § 1605(a)(7) is satisfied, as the evidence establishes a "reasonable connection between [Sudan's] provision of material support to [Al Qaeda] and the damage arising out of [the] terrorist attack" against the Cole. Rux, 461 F.3d at 473. Since 1993, the U.S. Department of State has designated Sudan as a state sponsor of terrorism in accordance with § 6(j) of the Export Administration Act, 50 U.S.C. § 2405(j). 58 Fed. Reg. 52523-01 (Oct. 8, 1993). The alleged acts occurred in a foreign state or states, so there is no arbitration requirement and, in any

---

[10]"Material support or resources" is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials[.]" 18 U.S.C. § 2339A(b)(1); see § 1605(a)(7) (incorporating the definition of "material support or resources" from 18 U.S.C. § 2339A(b)(1)).

[11]An "extrajudicial killing" for purposes of § 1605(a)(7) is defined in § 1605(e)(1) as having the same meaning given to that term in section 3 of the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note, i.e., "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include such killing that, under international law, is lawfully carried out under the authority of a foreign nation." 28 U.S.C. § 1605(a)(1); id. § 1350 note.

23

event, Plaintiffs made an offer to arbitrate on July 16, 2004 [Doc. No. 3]. Finally, the victims and claimants were nationals of the United States at the time of the alleged acts.

Personal jurisdiction over a non-immune sovereign exists so long as service of process has been made under § 1608 of the FSIA. 28 U.S.C. § 1330(b); see also Blais v. Islamic Republic of Iran, 459 F. Supp. 2d 40, 53-54 (D.D.C. 2006). As this Court previously concluded, Sudan waived personal jurisdiction, and service on Sudan was made in accordance with due process. See Order of Aug. 26, 2005 at 29-43 [Doc. No. 47]. The Court reaffirms its findings that it has in personam jurisdiction over Sudan and that venue is proper.

B.    Liability

While the FSIA vests jurisdiction in federal courts to hear cases against foreign states, it does not afford plaintiffs with a substantive cause of action. Thus, once a court determines that subject matter jurisdiction exists, it must determine what, if any, causes of action the plaintiff may bring against the defendant, and whether the foreign state is liable on any of those claims. See Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1133-36 (D.C. Cir. 2004); Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1033 (D.C. Cir. 2004); Dammerell v. Islamic Republic of Iran, No. 01-2224, 2005 WL 756090 at *5 (D.D.C. Mar. 29, 2005) (Bates, J.).

The question of which law provides Plaintiffs with a cause of action presents issues of first impression because the Cole attack occurred in a foreign state's territorial waters, possibly bringing the matter within the scope of U.S. admiralty laws. Plaintiffs contend that liability should be governed by the common law of intentional infliction of emotional distress ("IIED") of the state of Virginia, which is the state of residence of at least one of the victims killed aboard

24

the Cole, as well as federal maritime wrongful death law as recognized by the United States Supreme Court in <u>Moragne v. State Marine Lines, Inc.</u>, 398 U.S. 375, 90 S.Ct. 1772, 26 L. Ed. 2d 339 (1970). Sudan contends that Plaintiffs' *only* cause of action arises under the Death on the High Seas Act of 1920 (DOHSA), 46 U.S.C. app. §§ 761-767, that "supplemental" claims for emotional distress or wrongful death are precluded by DOHSA and therefore must be dismissed, and that Plaintiffs' claims for non-pecuniary damages are not recoverable under DOHSA.[12]

On February 15, 2007, this Court held a hearing on the choice of law question. Sudan appeared at the hearing but did not participate. At the hearing, Plaintiffs argued that DOHSA was inapplicable because a foreign state is not a "person" under the statute and Congress did not intend the statute to apply to foreign sovereigns. Pl.'s Am. Mem. 2-6. At the Court's invitation, however, Plaintiffs filed a Fourth Amended Complaint adding claims under DOHSA and stating separate claims for IIED and maritime wrongful death. Although Sudan was in default, on February 27, 2007, it filed a motion to dismiss Plaintiffs' IIED and wrongful death claims for failure to state a claim upon which relief can be granted on grounds that they were precluded by DOHSA and did not satisfy DOHSA's three-year statute of limitations. 46 U.S.C. app. § 763a; Fed. R. Civ. P. 12(b)(6). The Court, ruling from the bench during the final pretrial hearing, denied Sudan's motion but reserved ruling on which substantive law applied to this action. At trial, Plaintiffs raised the matter again, urging the Court to rule that DOHSA's provision limiting damages to pecuniary losses is inapplicable to terrorism cases such as this, and that DOHSA should not be read to preclude recovery of non-pecuniary damages for emotional distress despite

---

[12]Sudan first made this argument in its August 3, 2005, motion to dismiss. The Court took it under advisement pending a ruling by the Court of Appeals on jurisdiction.

25

the case law interpreting DOHSA as an exclusive remedy. Following trial, Plaintiffs filed two "supplemental" memoranda in support of their argument.

The Court is faced with three overarching questions: (1) What choice of law rules apply to claims against a state sponsor of terrorism under § 1605(a)(7)?; (2) What substantive law provides Plaintiffs with a cause of action against Sudan?; and (3) Which law provides the applicable statute of limitations in cases brought under § 1605(a)(7)? Because this is the first case arising under the terrorism exception in this Circuit, and because the case law under this exception is still developing generally, the Court begins with a discussion of the choice of law principles to be applied in cases arising under § 1605(a)(7).

### 1.    Causes of Action Under the FSIA

The United States Court of Appeals for the District of Columbia Circuit held in Cicippio-Puleo that the FSIA is a jurisdictional statute and "neither 28 U.S.C. § 1607(a)(7) nor the Flatow Amendment [to the FSIA],[13] nor the two considered in tandem, creates a private right of action against a foreign government." 353 F.3d at 1033. Prior to Cicippio-Puleo, district courts had held or assumed that the terrorism exception or the Flatow Amendment provided the standard of liability against which a foreign state's actions should be measured. Id. at 1032 (citing cases). Cicippio-Puleo clarified that § 1605(a)(7) "merely waives the immunity of a foreign state without creating a cause of action against it." 353 F.3d at 1033. The liability of a foreign state

_____

[13]The Flatow Amendment, enacted five months after the enactment of § 1605(a)(7), created a private right of action for conduct described in § 1605(a)(7) against "an official, employee, or agent of a foreign state" who was "acting within the scope of his or her office, employment, or agency . . . ." Pub. L. No. 104-208; Div. A, Title I, § 101(c), 110 Stat. 30009-172 (1996) (codified at 28 U.S.C. § 1605 note). See Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 12 (D.D.C. 1998).

whose immunity has been abrogated under any of the exceptions in § 1605 is determined according to § 1606, which provides: "As to any claim for which a foreign state is not entitled to immunity under section 1605 or section 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 1606; see First Nat'l City Bank v. Banco Para El Carcio Exterior de Cuba, 462 U.S. 611, 620, 103 S.Ct. 2591, 2597, 77 L. Ed. 2d 46 (1983) ("The language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality . . . ."). Thus, a plaintiff proceeding against a state sponsor of terrorism under § 1605(a)(7) "must identify a particular cause of action arising out of a specific source of law." Acree v. Republic of Iraq, 370 F.3d 41, 59 (D.C. Cir. 2004) (holding the "generic common law" to be insufficient); see also Blais, 459 F. Supp. 2d at 54 (holding that § 1606 acts as a "pass-through" to substantive causes of action).

In Dammerell, the district court sought to answer a question left unresolved after Cicippio-Puleo and Acree, namely what "particular causes of action . . . may be brought against a foreign state in a case proceeding under section 1605(a)(7)." 2005 WL 756090 at *11. After a lengthy examination of the text, structure, and legislative history of §§ 1605(a)(7) and 1606, and a comparison to the analogous statutory scheme of the Federal Tort Claims Act, the Dammerell court concluded that "the causes of action that may be brought against the foreign state . . . include any claims that can be brought against a private individual in like circumstances," including claims arising under "state common and statutory law, federal statutory law, and even the law of a foreign state." Id. at *14. The court continued, "Whether any of these sources will furnish a cause of action in a particular case will depend on several factors, including the

27

governing choice of law analysis, . . . and at least in the context of federal statutory claims, a careful inquiry into congressional intent . . . . The crucial point, however, is that there is nothing in section 1605(a)(7) that displaces the prevailing rule that a plaintiff may bring existing causes of action through section 1606 against foreign states." Id. Following Cicippio-Puleo and Acree, the United States District Court for the District of Columbia has uniformly held that the state common or statutory laws of the state of the plaintiff's domicile may be used to determine the liability of foreign states under the terrorism exception. See, e.g., Blais, 459 F. Supp. 2d at 54–55 (applying state laws of battery and IIED); Reed v. Islamic Republic of Iran, 439 F. Supp. 2d 53, 65-68 (D.D.C. 2006) (Massachusetts law); Price v. Socialist People's Libyan Arab Jamahiriya, 384 F. Supp. 120, 132-34 (D.D.C. 2005) (state law of assault, battery, and IIED); see also Virtual Dev. & Def. Int'l, Inc. v. Republic of Moldova, 133 F. Supp. 2d 9, 14 (D.D.C. 2001) ("[A]s a general matter, state substantive law is controlling in FSIA cases."). This precedent makes clear that a plaintiff proceeding against a state sponsor of terrorism under § 1605(a)(7) may bring a cause of action under state law, federal statutes, or, where appropriate, foreign law, as long as he or she "identif[ies] a particular cause of action arising out of a specific source of law." See Acree, 370 F.3d at 59.

The first step in a choice of law analysis is determining which choice of law rules to apply. In FSIA actions, courts are divided as to whether to apply the forum state's choice of law rules or federal common law. Compare Chuidian v. Philippine Nat'l Bank, 976 F.2d 561, 564 (9th Cir. 1992) and Harris v. Polskie Linie Lotnicze, 820 F.2d 1000, 1003 (9th Cir. 1987) (federal common law); with Barkanic v. Gen. Admin. of the Civil Aviation of the People's Republic of China, 923 F.2d 957, 960-61 (2d Cir. 1991) (finding that "forum law provides the

28

proper choice of law rules for FSIA cases"); see also 14A Charles Alan Wright, Arthur R.

Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3662, p. 321 (3d ed. 1998)

("[T]here is no clear understanding as to whether the forum state's choice-of-law rules should

apply or whether federal common law should govern an action against a foreign state or

instrumentality thereof.").

This case is unlike any other before it because it arose out of an attack against a U.S.

warship in foreign territorial waters. The parties agree that the appropriate choice of law

principles are those applicable to maritime torts derived from the United States Supreme Court's

opinion in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L. Ed. 1254 (1953) and its

progeny. Lauritzen set forth "several factors which, alone or in combination, are generally

conceded to influence choice of law to govern a tort claim, particularly a maritime tort

claim . . . ." 345 U.S. at 583, 73 S.Ct. at 928; see also Hawkspere Shipping Co., Ltd. v. Intamex,

S.A., 330 F.3d 225, 234 (4th Cir. 2003) (holding that Lauritzen factors are to be applied by

federal courts sitting in admiralty in the absence of a valid contractual choice of law). "Under

Lauritzen, a court must consider seven factors in determining the governing law for a particular

dispute: (1) the place of the wrongful act, if any; (2) the law of the flag; (3) the domicile of the

plaintiff; (4) the domicile of the shipowner; (5) the place of the contract; (6) the inaccessibility of

a foreign forum; and (7) the law of the forum." Id. (citing Lauritzen, 345 U.S. at 583-92, 73

S.Ct. at 932). The law of the flag is of "cardinal importance" and "supersedes the territorial

principle . . . because [a ship] 'is deemed to be a part of the territory of that sovereignty (whose

flag it flies), and not to lose that character when in navigable waters within the territorial limits

of another sovereignty.'" Lauritzen, 345 U.S. at 584-85, 73 S.Ct. at 929-30 (quoting United

States v. Flores, 289 U.S. 137, 155-159, 53 S.Ct. 580, 584-86, 77 L. Ed. 1086 (1933)); see also

Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 308, 90 S.Ct. 1731, 1734, 26 L. Ed. 2d 252 (1970)

("[T]he flag that a ship flies may, at times, alone be sufficient."). The place of the wrongful act

escapes easy definition because the wrongful acts occurred in Sudan, Yemen, and the Port of

Aden. Yet while the first factor is ambiguous, the remaining factors point overwhelmingly

towards the law of the United States. This case involves an act of terrorism against an American

warship flying the flag of the United States in which seventeen U.S. nationals were killed. The

courts of Yemen and Sudan are plainly inaccessible to Plaintiffs, all of whom are themselves

U.S. nationals and reside in the United States. Accordingly, United States law, rather than

foreign law, supplies the rule of decision.

　　　　2.　　Death on the High Seas Act

　　　　The next question is whether Plaintiffs' cause of action is based on a federal statute, i.e.

DOHSA, federal maritime law, state common law or state statutes, or some combination thereof.

Although many § 1605(a)(7) claims against foreign state sponsors of terrorism since Cicippio-

Puleo have been based on state laws, courts have applied federal statutes against foreign states

whose immunity was lifted pursuant to one of the exceptions in § 1605. See, e.g., Southway v.

Cent. Bank of Nigeria, 198 F.3d 1210, 1216 (10th Cir. 1999) (federal Racketeering Influenced

and Corrupt Organizations Act statute enforceable against a foreign state through the FSIA);

Mukaddam v. Permanent Mission of Saudi Arabia, 111 F. Supp. 2d 457, 470 (S.D.N.Y. 2000)

(foreign state "is liable under Title VII [of the Civil Rights Act of 1964] in the same manner and

to the same extent as a private employer would be in like circumstances"); Outboard Marine

Corp. v. Pezetel, 461 F. Supp. 384, 395-96 (D. Del. 1978) (suit against foreign government-

controlled entity under antitrust laws is cognizable through "commercial activity" exception of

the FSIA, 28 U.S.C. § 1605(a)(2)). As the court in Dammerell recognized, whether a particular

federal statute may be invoked against a foreign state is an "inherently delicate question,

requiring a court to assess Congress's intent across several statutes: the federal statute giving rise

to the cause of action; the relevant waiver of sovereign immunity in section 1605; and section

1606 itself." 2005 WL 756090 at *28.

The Death on the High Seas Act, 46 U.S.C. app. § 761 et seq. (reorganized and restated at

46 U.S.C. § 30301-30308), was enacted in 1920 in order to provide "a uniform and effective

wrongful death remedy for survivors of persons killed on the high seas." Offshore Logistics,

Inc. v. Tallentire, 477 U.S. 207, 214, 106 S.Ct. 2485, 2490, 91 L. Ed. 2d 174 (1986).[14] Section

761(a) of the Act, as it existed at the time of the events giving rise to this suit, provides:

> [W]henever the death of a person shall be caused by wrongful act, neglect, or
> default occurring on the high seas beyond a marine league from the shore of any
> State, or the District of Columbia, or the Territories or dependencies of the United
> States, the personal representative of the decedent may maintain a suit for damages
> in the district courts of the United States, in admiralty, for the exclusive benefit of
> the decedent's wife, husband, parent, child, or dependent relative against the vessel,
> person, or corporation which would have been liable if death had not ensued.

46 U.S.C. app. § 761(a). In enacting DOHSA, Congress repudiated the preexisting rule in The

Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L. Ed. 358 (1886), that no federal statute or general

federal maritime law existed that afforded a wrongful death cause of action to the survivors of

persons killed beyond state territorial waters. See The Hamilton, 207 U.S. 398, 404-05, 28 S.Ct.

133, 134-35, 52 L. Ed. 264 (1907) (pre-DOHSA case applying state wrongful death statutes to

---

[14]Congress repealed and recodified Title 46 effective October 6, 2006. Pub. L. No. 109-304, 120 Stat. 1485, 1512 (2006). A modified DOHSA is now at 46 U.S.C. § 30301-30308. Because the events at issue occurred in 2000, the version of DOHSA then in effect is applicable.

31

deaths on the high seas).  DOHSA was intended to remedy "[t]he void that existed in maritime law up until 1920[:] the absence of any remedy for wrongful death on the high seas[.]" Moragne, 398 U.S. at 398, 90 S.Ct. at 1786 (overruling The Harrisburg); see also H.R. Rep. No. 674, 66th Cong., 2d Sess., 3-4 (1920).

Whether DOHSA may be invoked against a foreign state whose immunity has been abrogated under the FSIA is evidently an issue of first impression.  The Court is unaware of a single case in which a foreign state was found liable in wrongful death under DOHSA, and no court has directly addressed whether such claims are cognizable.

To answer this question, the Court begins with the plain text of the statute.  By its terms, DOHSA is limited to circumstances where death stems from a "wrongful act, neglect or default" which "occur[red] on the high seas beyond a marine league from the shore of any State . . . ." 46 U.S.C. app. § 761.  The class of defendants is limited to "the vessel, person, or corporation which would have been liable if death had not ensued."  Id.  The class of beneficiaries is limited to the decedent's "wife, husband, parent, child, or dependent relative," id., and damages are limited to the "pecuniary loss sustained by the persons for whose benefit the suit is brought" unless death results from a commercial aviation accident.  Id. §§ 761(b), 762.

Plaintiffs concede that DOHSA's geographic scope, as interpreted, includes foreign territorial waters and that the Port of Aden in Yemen falls within this scope.  See, e.g., Howard v. Crystal Cruises, 41 F.3d 527, 529-30 (9th Cir. 1994) (territorial waters of Mexico are "high seas" under DOHSA); Azzopardi v. Ocean Drilling & Exploration Co., 742 F.2d 890, 892-94 (5th Cir. 1984) (English Channel); Mancuso v. Kimex, Inc., 484 F. Supp. 453, 455 (S.D. Fla. 1980) (Jamaican waters); see also 2 Benedict on Admiralty § 81b, pp. 7-7–7-8 n.18 (2007) ("It

32

appears to be settled that the term 'high seas' within the meaning of DOHSA is not limited to international waters, but includes the territorial waters of a foreign nation as long as they are more than a marine league away from any United States shore."). Plaintiffs, correctly in the Court's view, make no attempt to argue that terrorism falls outside the Act. Although this appears to be the first case under DOHSA involving material support of terrorism, such conduct certainly constitutes a "wrongful act" within the plain meaning of the term in § 761. For decades courts have applied the Act whenever death occurs on the high seas, whether caused by negligence or unseaworthiness, see, e.g., Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. 217, 116 S.Ct. 629, 133 L. Ed. 2d 596 (1996) (DOHSA claim against airline brought by survivors of passenger killed when airline was shot down over Sea of Japan in Soviet missile attack); Whitaker v. Blidberg-Rothchild Co., 195 F. Supp. 420, 421-23 (E.D. Va. 1961) (vessel and its owner liable for death of drowned seaman); Kuntz v. Windjammer Barefoot Cruises, Ltd., 573 F. Supp. 1277, 1282 (D. Pa. 1983) (cruise company liable for fatal scuba-diving accident on high seas), or even intentional conduct, see, e.g., Bowoto v. Chevron Corp., Case No. C 99-02506, 2006 WL 2455761 at *5 (N.D. Cal. Aug. 22, 2006) (DOHSA "clearly" applied to a claim brought on behalf of Nigerian individuals allegedly killed by the Nigerian military because the deaths "occurred [on an oil drilling platform] off the Nigerian coast and well over one marine league from U.S. shore"); The Samnanger, 298 F. 620, 622 (D. Ga. 1924) (homicide). The circumstances of this case thus fall squarely within the ambit of DOHSA.

Plaintiffs' sole argument is that foreign states are not proper defendants under DOHSA. But this argument overlooks contrary precedent in this and other jurisdictions, relies on inapplicable cases, and is premised on a misapplication of the FSIA and the terrorism

33

exception.[15] First, Plaintiffs' argument that a foreign state is not a "person" under DOHSA is belied by the fact that the United States has been consistently subject to liability for wrongful death on the high seas under DOHSA since the enactment in 1946 of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., which waived the United States' immunity for actions in tort. See, e.g., United States v. Gavagan, 280 F.2d 319, 321 (5th Cir. 1960) (holding United States liable under DOHSA through the FTCA for deaths resulting from negligent rescue efforts on the high seas); Blumenthal v. United States, 189 F. Supp. 439, 446-47 (E.D. Pa. 1960) ("In the same manner as a private person is liable under the Death on the High Seas Act, so, too, is the Government under the Federal Tort Claims Act."); Moran v. United States, 102 F. Supp. 275, 279 (D. Conn. 1951) (holding that FTCA extended the right of action created by DOHSA to claims against the United States for personal injury and deaths on the high seas); see also Roberts v. United States, 498 F.2d 520, 525-26 (9th Cir. 1974) (noting that prior to 1960 amendments to Suits in Admiralty Act, 46 U.S.C. §§ 741 et seq., FTCA waived sovereign immunity for claims brought under general maritime law and DOHSA). As the Supreme Court has noted:

> As enacted in 1920, [DOHSA] provided a remedy against private parties but contained no waiver of sovereign immunity. That changed with the enactment of the FTCA, which waived the sovereign immunity of the United States for claims arising on the high seas under the DOHSA and the general maritime law.

Smith v. United States, 507 U.S. 197, 208, 113 S.Ct. 1178, 1185, 122 L. Ed. 2d 548 (U.S. 1993); see also Roberts, 498 F.2d at 525 n.8 ("The DOHSA merely creates a cause of action for

---

[15]That Plaintiffs amended their Complaint to add claims under DOHSA largely renders this argument moot. The Court addresses it here for the sake of clarity and because Plaintiffs raised it again in their supplemental briefs following trial.

34

wrongful maritime death where none previously existed; the act does not contain any provision waiving sovereign immunity."). Congress presumably was aware of these cases against the United States in 1976 when it enacted the FSIA, which lifted foreign sovereign immunity for certain categories of cases much the same way as the FTCA lifted the United States' immunity in certain tort cases. See St. Louis, I.M. & S. Ry. Co. v. United States, 251 U.S. 198, 207, 40 S.Ct. 120, 122, 64 L. Ed. 225 (1920) ("[C]ongress must be presumed to have known of its former legislation . . . and to have passed the new laws in view of the provisions of the legislation already enacted."). In enacting the FSIA, Congress prescribed "when and how parties can maintain a lawsuit against a foreign state or its entities in the courts of the United States and . . . when a foreign state is entitled to sovereign immunity." H. R. Rep. No. 94-1487, 94th Cong., 2d Sess. at 6, as reprinted in 1976 U.S.C.C.A.N. 6604; see Permanent Mission of India to the United Nations v. City of New York, ----U.S.----, ----, 127 S.Ct 2352, 2357 (2007) ("In enacting the FSIA, Congress intended to codify the restrictive theory's limitation of immunity to sovereign acts."); Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 488, 103 S.Ct. 1962, 1968, 76 L. Ed. 2d 81 (1983) (the Act "codifies, as a matter of federal law, the restrictive theory of sovereign immunity"). Prior to the FSIA, a waiver of sovereign immunity was necessary before a suit against a foreign state could have been brought, and courts deferred to the suggestions of the U.S. Department of State on whether to take jurisdiction over a particular suit. See id. at 486, S.Ct. at 1967 (citing The Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116, 3 L. Ed. 287 (1812)). It is particularly instructive that the FTCA and the FSIA contain nearly identical language with respect to the standard of liability to be applied when immunity has been lifted. Compare 28 U.S.C. § 1346(b)(1) (providing that United States may be liable for tortious

35

acts or omissions of its employees acting within the scope of their office or employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred") with 28 U.S.C. § 1606 ("As to any claim for which a foreign state is not entitled to immunity under section 1605 or section 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ."). To permit wrongful death suits against the United States under DOHSA pursuant to the waiver of immunity in the FTCA, but prohibit identical suits against *foreign* states pursuant to the analogous waiver in the FSIA, would defy logic. It would also be inconsistent with the FSIA, which was "not intended to affect the substantive law determining the liability of a foreign state or instrumentality," First Nat'l City Bank, 462 U.S. at 620, 103 S.Ct. at 2597, and the terrorism exception itself, which "does not impose liability or mention a cause of action," Cicippio-Puleo, 353 F.3d at 1034. Thus, contrary to Plaintiffs' assertion that DOHSA suits against foreign states are impermissible because Congress has not *specifically* singled out foreign states as potential defendants under the Act, it is unsurprising and entirely appropriate that Congress did not speak to DOHSA when it passed the FSIA in 1976 or when it added the terrorism exception in 1996.

The Court's conclusion that a foreign state may be sued under DOHSA finds further support in this Circuit's precedent interpreting the Act. In Gerding v. Republic of France, 943 F.2d 521 (4th Cir. 1991), personal representatives of a passenger who became ill and died aboard a French vessel off the Canary Islands sued the Republic of France, and French officials and agencies, under DOHSA and other statutes. Id. at 523-24. The Fourth Circuit affirmed the district court's finding that France was immune from suit under the FSIA without considering

36

what law to apply and without giving any indication one way or the other as to whether DOHSA could apply to a foreign state. In Boykin v. Bergesen D.Y. A/S, 835 F. Supp. 274 (E.D. Va. 1993) (Morgan, J.), this Court found that a Chinese corporation called China Steel was not entitled to immunity under the FSIA for the death of a merchant ship's master killed by a methane explosion on the high seas, and awarded pecuniary damages under DOHSA. Id. at 287 n.20. The Court added in a footnote, "Assuming *arguendo* that China Steel qualifies as a foreign state under the FSIA," it was still subject to suit under the waiver and commercial activity exceptions to the FSIA, 28 U.S.C. § 1605(a)(1) & (2)), suggesting that the DOHSA claim could proceed against China Steel even if it were a "foreign state" under the FSIA.

Plaintiffs' arguments as to why foreign states are not "persons" are not persuasive. The cases they cite construing the term "person" as used in the Due Process Clause and other statutes deal with plainly different circumstances. See, e.g., Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 96 (D.C. Cir. 2002) (holding that foreign state is not a "person" for purposes of the Due Process Clause). Moreover, Plaintiffs overlook that the Supreme Court has held that a foreign state may be a "person" under the Clayton Act even though the statute does not clearly define the term "person." See Pfizer, Inc. v. Gov't of India, 434 U.S. 308, 320, 98 S.Ct. 584, 591-92, 54 L. Ed. 2d 769 (1978). As the Court noted in Pfizer, the "word 'person,' is not a term of art with a fixed meaning wherever it is used" and "this Court has expressly noted that use of the word 'person' in the Sherman and Clayton Acts did not create a 'hard and fast rule of exclusion' of governmental bodies." Id. at 315-16, 98 S.Ct. at 589 (citing United States v. Cooper Corp., 312 U.S. 600, 604-05, 61 S.Ct. 742, 743, 85 L. Ed. 1071 (1941), superseded by

statute, 15 U.S.C. § 15a).[16]

The only terrorism exception case to which Plaintiffs cite for the proposition that DOHSA does not apply to foreign states, Alejandre v. Republic of Cuba, 996 F. Supp. 1239 (D.D.C. 1997), is likewise unavailing. Alejandre involved an action against the Republic of Cuba under the terrorism exception arising out of the Cuban Air Force's shooting down of two civilian planes over international waters in the Straits of Florida, which killed three United States nationals. Id. at 1242–47. Plaintiffs argue that Alejandre "would appear to be a case where DOHSA would apply if Sudan's contentions were correct" because the death occurred on the "high seas" under the Act. Pls.' Supp. Mem. at 3. Although the court did not apply DOHSA in Alejandre, this is because the opinion was issued several years before the D.C. Circuit's opinion in Cicippio-Puleo, and was grounded in the now-defunct assumption that § 1605(a)(7) provided a freestanding cause of action against state sponsors of terrorism. Not surprisingly in light of this fact, the post-Cicippio-Puleo issue of what substantive law to apply was never even raised.

For these reasons, the Court FINDS that DOHSA is among the sources of law that may be invoked against a foreign state under § 1605(a)(7) of the FSIA, that Plaintiffs have met the requirements of DOHSA in this suit against Sudan, and that Sudan is liable to Plaintiffs under DOHSA for the wrongful deaths of the seventeen sailors killed aboard the Cole.

3.    Maritime Wrongful Death and Intentional Infliction Claims

---

[16]The only case cited by Plaintiffs which remotely discusses whether foreign states may be sued under DOHSA, Nejad v. United States, 724 F. Supp. 753 (C.D. Cal. 1989), involved a suit against the United States and its contractors—not a *foreign* government. Moreover, though Nejad does state, "It is not disputed that, if a claim can be maintained, DOHSA provides the jurisdictional basis as against the *non-government defendants*," id. at 756 (emphasis added), this sentence, which is not elaborated upon in the opinion, cannot reasonably be read to mean that DOHSA does *not* provide a cause of action against a governmental defendant.

38

The Court next turns to Plaintiffs' argument that DOHSA does not preclude them from also bringing claims for wrongful death under the general maritime basis for recovery recognized in Moragne, and for intentional infliction of emotional distress under Virginia law. Plaintiffs assert that because no court has ever ruled that DOHSA's rules on damages apply to foreign states, the Court has a clean slate upon which to write. Plaintiffs contend that despite the plain language of DOHSA it would be unfair to limit their damages to pecuniary losses in light of prior cases against state sponsors of terrorism that awarded damages for emotional distress and other non-pecuniary losses. In Plaintiffs' view, DOHSA should not be construed to benefit a state sponsor of terrorism simply because the decedents happened to die on the high seas, and to hold otherwise would defeat the purpose of the terrorism exception. As a fallback argument, Plaintiffs contend that their claim for IIED is not preempted by DOHSA because it is not a "wrongful death" claim brought on behalf of the decedents, but rather a "separate" claim for Plaintiffs' own emotional distress experienced upon learning of the attack against the Cole.

Plaintiffs' arguments are unavoidably foreclosed by the plain text of DOHSA and the Supreme Court case law interpreting it. Section 762 of DOHSA provides that damages are limited to the "pecuniary loss sustained by the persons for whose benefit the suit is brought." § 762. DOHSA thus limits compensation "to prospective and material loss for the relief of others than the decedent—to reimbursement for the post-death, 'pecuniary' deprivation of his dependents." United States v. S.S. Washington, 172 F. Supp. 905, 908 (D. Va. 1959). The Supreme Court has held that survivors of a person killed on the high seas may not supplement the remedy under DOHSA with an action for loss of society damages, Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 624-25, 98 S.Ct. 2010, 2014-15, 56 L. Ed. 2d 581 (1978), or a

39

claim under a state's wrongful death statute for non-pecuniary damages. Tallentire, 477 U.S. at

232, 106 S.Ct. at 2499 (holding that Louisiana wrongful death statute was preempted by

DOHSA). The Court has also held that survival claims brought by a decedent's estate for pre-

death pain and suffering are precluded by DOHSA. Dooley v. Korean Air Lines Co., Ltd., 524

U.S. 116, 122-24, 118 S.Ct. 1890, 1894-95, 141 L. Ed. 2d 102 (1998). The Court based each of

these holdings on the principle that DOHSA

> announces Congress' considered judgment on such issues as the beneficiaries,
> the limitations period, contributory negligence, survival, and damages . . . . The
> Act does not address every issue of wrongful-death law, . . . but when it does
> speak directly to a question, the courts are not free to 'supplement' Congress'
> answer so thoroughly that the Act becomes meaningless.

Higginbotham, 436 U.S. at 625, 98 S.Ct. at 2015 (finding that loss-of-society damages could not

be recovered by dependents of a longshoreman killed on the high seas).

That this case involves terrorism, and that it is against a foreign state sponsor of

terrorism, does not overcome the fact that DOHSA is an exclusive remedy. As the Supreme

Court has stated, Congress has "struck the balance for us. It has limited survivors to recovery of

their pecuniary losses." Id. at 623, 98 S.Ct. at 2014. And as the Court noted in Dooley, "By

authorizing only certain surviving relatives to recover damages, and by limiting damages to the

pecuniary losses sustained by those relatives, Congress provided the exclusive recovery for

deaths that occur on the high seas" and therefore "has precluded the judiciary from enlarging

either the class of beneficiaries or the recoverable damages" under DOHSA. 524 U.S. at 123,

118 S.Ct. at 1894-95. The Court's creation of a terrorism exception to DOHSA would not only

be contrary to the text of DOHSA, it would also undermine Congress' purpose of enacting a

uniform statutory remedy for wrongful death on the high seas. See Yamaha Motor Corp., U.S.A.

v. Calhoun, 516 U.S. 199, 215, 116 S.Ct. 619, 628, 133 L. Ed. 2d 578 (1996) (stating in

reference to DOHSA, "When Congress has prescribed a comprehensive tort recovery regime to

be uniformly applied, there is, we have generally recognized, no cause for enlargement of the

damages statutorily provided.").[17]   Contrary to Plaintiffs' contention that the issue is open for

judicial interpretation, "Congress has spoken directly to the question of recoverable damages on

the high seas," Miles v. Apex Marine Corp., 498 U.S. 19, 31, 111 S.Ct. 317, 325, 112 L. Ed. 2d

275 (1990) (citing Higginbotham, 436 U.S. at 625, 98 S.Ct. at 2015), and this Court is in no

position to rewrite the statute. See also Dooley, 524 U.S. at 124, 118 S.Ct. at 1895 ("Congress

has spoken on . . . the losses to be recovered, and the beneficiaries, in cases of death on the high

seas[.]").[18]

     The Court is well aware that other plaintiffs in other cases brought under the terrorism

exception have recovered damages that exceed those available under DOHSA.  But in every one

of those cases following Cicippio-Puleo the plaintiffs' damages were determined according to

---

[17]Plaintiffs' Supplemental Memorandum offers two cases, but neither addresses the issue
here, i.e. whether DOHSA preempts state-law claims for IIED.  See Wallis v. Princess Cruises,
306 F.3d 827, 842 n.5 (9th Cir. 2002) (finding that the court does "not need to reach Princess'
alternative argument that the claim is preempted by DOHSA"); Cummings v. Holland Am. Line
Westours, 1999 A.M.C. 2282, 1999 WL 1293577 at *3 (W.D. Wash. 1999) (dismissing
negligent infliction of emotional distress claim "does not affect" IIED claims).  In fact, one court
has noted that DOHSA preempts a separate action for negligent infliction of emotional distress.
See Howard v. Crystal Cruises, Inc., 1992 A.M.C. 1645, 1654, 1992 WL 194659 (E.D. Cal.
1992).

[18]Because DOHSA is an exclusive remedy, the Court need not decide whether Plaintiffs
may pursue a claim against Sudan based on the maritime remedy in Moragne.  However, it bears
noting that Plaintiffs have offered no support for the proposition, implicit in their Fourth
Amended Complaint, that Moragne, which held that general maritime law provided a cause of
action for wrongful death in U.S. state territorial waters, see 398 U.S. at 409, 90 S.Ct. at 1792,
should be extended to this case, which involved deaths in the territorial waters of Yemen.

41

the applicable substantive law, which is precisely what 28 U.S.C. § 1606 of the FSIA requires.

See Blais, 459 F. Supp. 2d at 58 (holding that plaintiffs "are entitled to the typical bases of

damages that may be awarded against tortfeasors under the laws of Florida and Virginia");

Greenbaum v. Islamic Republic of Iran, 451 F. Supp. 2d 90, 105 (D.D.C. 2006) (awarding

"typical array of damages" under California law); Price, 384 F. Supp. 2d at 134 ("Because

section 1606 of the FSIA provides that a 'foreign state shall be liable in the same manner and to

the same extent as a private individual under like circumstances,' 28 U.S.C. § 1606, plaintiffs are

entitled to the typical array of compensatory damages that may be awarded against tortfeasors in

Texas and California . . . ."); see also Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C.

Cir. 2003) (noting that § 1606 empowers judges to "find the relevant law, not to make it").

Plaintiffs' theory that family members of victims of terrorism are themselves victims may be true

as a factual matter, but, unfortunately, as a legal matter it does not circumvent the Supreme

Court's holdings on DOHSA. Plaintiffs assert that Beaty v. Republic of Iraq, 480 F. Supp. 2d 60

(D.D.C. 2007), "holds that the families of those affected by terrorism are direct victims entitled

to assert independent claims" for IIED. Pls.' Supp. Authority at 1. However, Beaty's discussion

of the victims of terrorism related to the "presence" requirement in IIED claims brought under

the terrorism exception to the FSIA, and had nothing to do with the preemption issue raised by

DOHSA. 480 F. Supp. 2d at 93-94. Applying DOHSA's damages provisions along with the

cause of action provided in DOHSA is perfectly consistent with the FSIA and the terrorism

exception.

The Court sympathizes greatly with Plaintiffs, who continue to suffer terribly years after

their loved ones died. But the Court is bound to follow the legal precedent before it. Congress

makes the laws; courts merely interpret them. Whether to amend DOHSA to allow more liberal

recovery in cases of death caused by terrorism on the high seas, as Congress did in 2000 for

cases of commercial aviation accidents on the high seas, is a question for Congress alone.[19]

Accordingly, Plaintiffs' IIED and maritime wrongful death claims are **DISMISSED** for failure

to state a claim upon which relief can be granted.

        4.    **Statute of Limitations**

      The Court need not spend long on Sudan's argument that Plaintiffs' Complaint was not

filed within DOHSA's three-year statute of limitations. See 46 U.S.C. app. § 763a. While the

FSIA is silent with respect to the appropriate statute of limitations to be applied in cases brought

under exceptions other than § 1605(a)(7), it singles out the terrorism exception as meriting a ten-

year limitations period. 28 U.S.C. § 1605(f) provides:

> No action shall be maintained under subsection (a)(7) unless the action is
> commenced not later than 10 years after the date on which the cause of action arose.
> All principles of equitable tolling, including the period during which the foreign
> state was immune from suit, shall apply in calculating this limitation period.

28 U.S.C. § 1605(f). The D.C. district court has interpreted § 1605(f) as having a preemptive

effect on other statute of limitations periods. See Owens v. Republic of Sudan, 412 F. Supp. 2d

99, 117 (D.D.C. 2006) (holding that state statute of limitations periods are "irrelevant" to

lawsuits brought under terrorism exception); Wyatt v. Syrian Arab Republic, 398 F. Supp. 2d

131, 143 (D.D.C. 2005). Indeed, a necessary corollary of Congress' power to decide the

circumstances under which foreign states may be sued is the authority to determine *when* causes

---

[19]Congress amended DOHSA to allow "additional compensation for nonpecuniary
damages" in commercial aviation accidents on the high seas beyond twelve nautical miles from
the shore of any State. Pub. L. 106-181, § 404(a)-(b), 114 Stat. 61 (2000) (codified at 46 U.S.C.
app. §§ 761(b) & 762 (b)(1) and repealed and recodified at 46 U.S.C. § 30307).

of action may be commenced against foreign states. See id. ("[W]hile Congress may choose to waive a foreign state's immunity and allow causes of action to be brought against it 'in the same manner and to the same extent as a private individual under like circumstances,' 28 U.S.C. § 1606, it is not therefore stripped of its authority to require its own statute of limitations to apply in cases against foreign states as a *condition* of that waiver."). Contrary to Sudan's argument that applying the ten-year period instead of a shorter one would "enlarge a substantive cause of action contrary to the intent of Congress," Def. Mot. Dismiss 17, the ten-year period is exactly what Congress intended to apply in cases under § 1605(a)(7). Accordingly, the Court concludes that the ten-year statute of limitations under § 1605(f) applies, and that Plaintiffs' Complaint, which was filed on July 16, 2004, was timely filed.

## III.   DAMAGES

"No section of the FSIA directly addresses the quantum of proof for damages." Hill v. Republic of Iraq, 328 F.3d 680, 683 (D.C. Cir. 2003). However, consistent with 28 U.S.C. § 1606, an "FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." Id. at 683-84 (citing § 1606).

DOHSA provides that recovery in a suit brought under the Act "shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought." 46 U.S.C. app. § 762. Pecuniary losses may include loss of support, loss of the services of the deceased, loss of nurture, guidance, care and instruction, loss of inheritance, and funeral expenses if paid by the dependents. Boykin, 835 F. Supp. at 285 (citing Thomas J. Schoenbaum, Admiralty and Maritime Law, § 7-2 (1987)).

The Court, relying upon the seventeen decedents' income taxes and other evidence, has

calculate lost earnings that would have been available for contribution had the decedent lived, the Court multiplied each decedent's earnings at the time of death by the number of years that the decedent likely would have worked, assuming various annual rates of wage growth that depend on the decedent's education level and including non-taxable allowances paid by the Navy. The Court took into account the following factors: the amount of time each sailor would have likely stayed in the Navy; the retirement age and age of death; the savings rate; the amount the decedent would have used for his or her own consumption; the taxes he or she would have paid; and the decedent's estate from which children had a reasonable expectation of benefitting. See, e.g., Solomon v. Warren, 540 F.2d 777, 786-95 (5th Cir. 1976); Cox v. Nw. Airlines, Inc., 379 F.2d 893, 896 (7th Cir. 1967); Boykin, 835 F. Supp. at 286; In re the Adventure Bound Sports, Inc., 858 F. Supp. 1192, 1197-1211 (S.D. Ga. 1994). As is required, the future lost earnings were reduced to their "present value" through the use of a discount rate. See Brown v. United States, 615 F. Supp. 391, 395 (D. Mass. 1985). The lost earnings were apportioned among the decedents' eligible surviving family members, with minor children receiving benefits until the age of majority. See 42 U.S.C. app. § 762 (recovery shall be apportioned among persons for whose benefit suit is brought in proportion to loss they may severally have suffered by reason of decedent's death). For those decedents who left children, the Court will award the pecuniary value of the loss of nurture, care, and guidance to each child until he or she reaches the age of twenty-one. See Boykin, 835 F. Supp. at 286. Although it gives the Court no pleasure to do so, it refuses Plaintiffs' request for damages for loss of consortium, loss of solatium, loss of society, mental anguish and emotional distress, because, as emphasized earlier, each of these is non-pecuniary in nature and consequently cannot be recovered under DOHSA. See 46 U.S.C.

46

app. § 762; <u>Boykin</u>, 835 F. Supp. at 285.

The Court **FINDS** that Sudan is liable for the following damages for the pecuniary losses suffered by the following individuals:

**Family of Kenneth Eugene Clodfelter**

1.      Jennifer Clodfelter (spouse): $296,631

2.      Jennifer Clodfelter as next friend of Noah Clodfelter (son): $201,831

3.      John Clodfelter (father): $0

4.      Gloria Clodfelter (mother): $0

**Family of Richard Costelow**

1.      Sharla Costelow (wife): $549,658

2.      Sharla Costelow as next friend of Ethan Costelow (son): $235,309

3.      Sharla Costelow as next friend of Brady Costelow (son): $213,369

4.      George Costelow (father): $0

5.      Dorothy Costelow (mother): $0

**Family of Lakeina Monique Francis**

1.      Ronald Wallace Francis (father): $104,648

2.      Sandra Annette Francis (mother): $104,648

**Family of Timothy Lee Gauna**

1.      Sarah Gauna-Esquivel (mother): $269,898

**Family of Cherone Louis Gunn**

1.      Louge Gunn (father): $136,310

2.      Mona Gunn (mother): $136,310

47

5.     Matthew Parlett (brother): $0

**Family of Patrick Howard Roy**

1.     Kate Brown (mother): $234,835

2.     Sean Walsh (brother): $0

3.     Kevin Michael Roy (brother): $0

**Family of Kevin Shawn Rux**

1.     Olivia Rux (wife): $471,327

**Family of Ronchester Mananga Santiago**

1.     Rogelio Santiago (father): $157,708

2.     Simeona Santiago (mother): $157,708

**Family of Timothy Lamont Saunders**

1.     Jacqueline Saunders (wife): $368,126

2.     Jacqueline Saunders as next friend of Isley Gayle Saunders (daughter): $147,666

3.     Jacqueline Saunders as next friend of Jocelyn Tiera Saunders (daughter): $177,380

**Family of Gary Graham Swenchonis**

1.     Gary G. Swenchonis (father): $141,175

2.     Deborah Swenchonis (mother): $142,375

3.     Shalalah Swenchonis-Wood (sister): $0

**Family of Andrew Triplett**

1.     Lorrie D. Triplett (wife): $781,465

2.     Lorrie D. Triplett as next friend of Andrea Triplett (daughter): $220,561

49

3.  Lorrie D. Triplett as next friend of Savannah R. Triplett (daughter): $271,668

4.  Reed Triplett (father): $0

5.  Savannah Triplett (mother): $0

6.  Kevin Triplett (brother): $0

7.  Wayne Triplett (brother): $0

8.  Freddie Triplett (brother): $0

9.  Theodis Triplett (brother): $0

**Family of Craig Brian Wibberly**

1.  Thomas Wibberly (father): $153,489

2.  Patricia Wibberly (mother): $153,489

3.  Toni Wibberly (sister): $0

## IV.    CONCLUSION

Plaintiffs have established satisfactory evidence, pursuant to 28 U.S.C. § 1608(e), that Sudan is liable for its provision of material support and resources to Al Qaeda that enabled the terrorist group to bring about the extrajudicial killing of seventeen honorable American servicemen and women on October 12, 2000.

We have heard testimony from, and about, those family members who have suffered from the loss of these young men and women. The psychological effects on the survivors can never be erased, especially given that they were caused by a senseless act deliberately enabled by a rogue government. It is depressing to realize that a country organized on a religious basis with religious rule of law could and would execute its power for purposes which most countries would find intolerable and loathsome. It is a further tragedy that the laws of the United States, in

50

this instance, provide no remedy for the psychological and emotional losses suffered by the survivors.

For the reasons set forth herein, it is hereby **ORDERED** that judgment be entered in favor of Plaintiffs and against Defendant Republic of Sudan in the amounts set forth above. The judgments against Defendant total $7,956,344. Defendant shall pay post-judgment interest at the applicable post-judgment federal rate from today's date until paid in full.

The Clerk of the Court is **DIRECTED** to transmit a copy of this Order to all counsel of record via United States mail. The Clerk shall cause a copy of this Order and Opinion and accompanying judgment to be translated into Arabic and transmitted to the United States Department of State for diplomatic service upon Defendant Republic of Sudan in accordance with the provisions of 28 U.S.C. § 1608(a)(4), with the costs of translation to be paid by Plaintiffs. See 28 U.S.C. § 1608(e).


**IT IS SO ORDERED.**


_____/s/_____
UNITED STATES DISTRICT JUDGE

July 25, 2007
Norfolk, Virginia

51

# SEC. 1083. TERRORISM EXCEPTION TO IMMUNITY.

(a) Terrorism Exception to Immunity-

(1) IN GENERAL- Chapter 97 of title 28, United States Code, is amended by inserting after section 1605 the following:

`Sec. 1605A. Terrorism exception to the jurisdictional immunity of a foreign state

`(a) In General-

`(1) NO IMMUNITY- A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

`(2) CLAIM HEARD- The court shall hear a claim under this section if--

`(A)(i)(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or

`(II) in the case of an action that is refiled under this section by reason of section 1083(c)(2)(A) of the National Defense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) (as in effect before the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) was filed;

`(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred--

`(I) a national of the United States;

`(II) a member of the armed forces; or

`(III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and

`(iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration; or



EXHIBIT

B

`(B) the act described in paragraph (1) is related to Case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia.

`(b) Limitations- An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) not later than the latter of--

`(1) 10 years after April 24, 1996; or

`(2) 10 years after the date on which the cause of action arose.

`(c) Private Right of Action- A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--

`(1) a national of the United States,

`(2) a member of the armed forces,

`(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

`(4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

`(d) Additional Damages- After an action has been brought under subsection (c), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection (c) is based.

`(e) Special Masters-

`(1) IN GENERAL- The courts of the United States may appoint special masters to hear damage claims brought under this section.

`(2) TRANSFER OF FUNDS- The Attorney General shall transfer, from funds available for the program under section 1404C of the Victims of Crime Act of 1984 (42 U.S.C. 10603c), to the Administrator of the United States district court in which any case is pending which has been brought or maintained under this section such funds as may be required to cover the costs of special masters appointed under paragraph (1). Any amount paid in compensation to any such special master shall constitute an item of court costs.

`(f) Appeal- In an action brought under this section, appeals from orders not conclusively ending the litigation may only be taken pursuant to section 1292(b) of this title.

`(g) Property Disposition-

`(1) IN GENERAL- In every action filed in a United States district court in which jurisdiction is alleged under this section, the filing of a notice of pending action pursuant to this section, to which is attached a copy of the complaint filed in the

action, shall have the effect of establishing a lien of lis pendens upon any real property or tangible personal property that is--

`(A) subject to attachment in aid of execution, or execution, under section 1610;

`(B) located within that judicial district; and

`(C) titled in the name of any defendant, or titled in the name of any entity controlled by any defendant if such notice contains a statement listing such controlled entity.

`(2) NOTICE- A notice of pending action pursuant to this section shall be filed by the clerk of the district court in the same manner as any pending action and shall be indexed by listing as defendants all named defendants and all entities listed as controlled by any defendant.

`(3) ENFORCEABILITY- Liens established by reason of this subsection shall be enforceable as provided in chapter 111 of this title.

`(h) Definitions- For purposes of this section--

`(1) the term `aircraft sabotage' has the meaning given that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation;

`(2) the term `hostage taking' has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages;

`(3) the term `material support or resources' has the meaning given that term in section 2339A of title 18;

`(4) the term `armed forces' has the meaning given that term in section 101 of title 10;

`(5) the term `national of the United States' has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

`(6) the term `state sponsor of terrorism' means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism; and

`(7) the terms `torture' and `extrajudicial killing' have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note).'.

(2) AMENDMENT TO CHAPTER ANALYSIS- The table of sections at the beginning of chapter 97 of title 28, United States Code, is amended by inserting after the item relating to section 1605 the following:

`1605A. Terrorism exception to the jurisdictional immunity of a foreign state.'.

(b) Conforming Amendments-

(1) GENERAL EXCEPTION- Section 1605 of title 28, United States Code, is amended--

(A) in subsection (a)--

(i) in paragraph (5)(B), by inserting `or' after the semicolon;

(ii) in paragraph (6)(D), by striking `; or' and inserting a period; and

(iii) by striking paragraph (7);

(B) by repealing subsections (e) and (f); and

(C) in subsection (g)(1)(A), by striking 'but for subsection (a)(7)' and inserting 'but for section 1605A'.

(2) COUNTERCLAIMS- Section 1607(a) of title 28, United States Code, is amended by inserting 'or 1605A' after '1605'.

(3) PROPERTY- Section 1610 of title 28, United States Code, is amended--

(A) in subsection (a)(7), by striking '1605(a)(7)' and inserting '1605A';

(B) in subsection (b)(2), by striking '(5), or (7), or 1605(b)' and inserting 'or (5), 1605(b), or 1605A';

(C) in subsection (f), in paragraphs (1)(A) and (2)(A), by inserting '(as in effect before the enactment of section 1605A) or section 1605A' after '1605(a)(7)'; and

(D) by adding at the end the following:

'(g) Property in Certain Actions-

'(1) IN GENERAL- Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of--

'(A) the level of economic control over the property by the government of the foreign state;

'(B) whether the profits of the property go to that government;

'(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

'(D) whether that government is the sole beneficiary in interest of the property; or

'(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

'(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE- Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

'(3) THIRD-PARTY JOINT PROPERTY HOLDERS- Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.'.

(4) VICTIMS OF CRIME ACT- Section 1404C(a)(3) of the Victims of Crime Act of 1984 (42 U.S.C. 10603c(a)(3)) is amended by striking 'December 21, 1988

with respect to which an investigation or' and inserting `October 23, 1983, with respect to which an investigation or civil or criminal'.

(c) Application to Pending Cases-

(1) IN GENERAL- The amendments made by this section shall apply to any claim arising under section 1605A of title 28, United States Code.

(2) PRIOR ACTIONS-

(A) IN GENERAL- With respect to any action that--

(i) was brought under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208), before the date of the enactment of this Act,

(ii) relied upon either such provision as creating a cause of action,

(iii) has been adversely affected on the grounds that either or both of these provisions fail to create a cause of action against the state, and

(iv) as of such date of enactment, is before the courts in any form, including on appeal or motion under rule 60(b) of the Federal Rules of Civil Procedure,

that action, and any judgment in the action shall, on motion made by plaintiffs to the United States district court where the action was initially brought, or judgment in the action was initially entered, be given effect as if the action had originally been filed under section 1605A(c) of title 28, United States Code.

(B) DEFENSES WAIVED- The defenses of res judicata, collateral estoppel, and limitation period are waived--

(i) in any action with respect to which a motion is made under subparagraph (A), or

(ii) in any action that was originally brought, before the date of the enactment of this Act, under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208), and is refiled under section 1605A(c) of title 28, United States Code,

to the extent such defenses are based on the claim in the action.

(C) TIME LIMITATIONS- A motion may be made or an action may be refiled under subparagraph (A) only--

(i) if the original action was commenced not later than the latter of-

(I) 10 years after April 24, 1996; or

(II) 10 years after the cause of action arose; and

(ii) within the 60-day period beginning on the date of the enactment of this Act.

(3) RELATED ACTIONS- If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, or

section 589 of the Foreign Operations, Export Financing, and Related Programs
Appropriations Act, 1997 (as contained in section 101(c) of division A of Public
Law 104-208), any other action arising out of the same act or incident may be
brought under section 1605A of title 28, United States Code, if the action is
commenced not later than the latter of 60 days after--

   (A) the date of the entry of judgment in the original action; or
   (B) the date of the enactment of this Act.
(4) PRESERVING THE JURISDICTION OF THE COURTS- Nothing in section
1503 of the Emergency Wartime Supplemental Appropriations Act, 2003 (Public
Law 108-11, 117 Stat. 579) has ever authorized, directly or indirectly, the making
inapplicable of any provision of chapter 97 of title 28, United States Code, or the
removal of the jurisdiction of any court of the United States.
(d) Applicability to Iraq-
   (1) APPLICABILITY- The President may waive any provision of this section
   with respect to Iraq, insofar as that provision may, in the President's
   determination, affect Iraq or any agency or instrumentality thereof, if the
   President determines that--
      (A) the waiver is in the national security interest of the United States;
      (B) the waiver will promote the reconstruction of, the consolidation of
      democracy in, and the relations of the United States with, Iraq; and
      (C) Iraq continues to be a reliable ally of the United States and partner in
      combating acts of international terrorism.
   (2) TEMPORAL SCOPE- The authority under paragraph (1) shall apply--
      (A) with respect to any conduct or event occurring before or on the date of
      the enactment of this Act;
      (B) with respect to any conduct or event occurring before or on the date of
      the exercise of that authority; and
      (C) regardless of whether, or the extent to which, the exercise of that
      authority affects any action filed before, on, or after the date of the
      exercise of that authority or of the enactment of this Act.
   (3) NOTIFICATION TO CONGRESS- A waiver by the President under
   paragraph (1) shall cease to be effective 30 days after it is made unless the
   President has notified Congress in writing of the basis for the waiver as
   determined by the President under paragraph (1).
   (4) SENSE OF CONGRESS- It is the sense of the Congress that the President,
   acting through the Secretary of State, should work with the Government of Iraq
   on a state-to-state basis to ensure compensation for any meritorious claims based
   on terrorist acts committed by the Saddam Hussein regime against individuals
   who were United States nationals or members of the United States Armed Forces
   at the time of those terrorist acts and whose claims cannot be addressed in courts
   in the United States due to the exercise of the waiver authority under paragraph
   (1).
(e) Severability- If any provision of this section or the amendments made by this section,
or the application of such provision to any person or circumstance, is held invalid, the
remainder of this section and such amendments, and the application of such provision to

other persons not similarly situated or to other circumstances, shall not be affected by such invalidation.